2003-NMCA-106

75 P.3d 843

**CITY OF SUNLAND PARK,**
Petitioner–Appellee,

v.

**SANTA TERESA SERVICES COMPANY,** a New Mexico corporation, **Charles Crowder and Phyllis Crowder,** Defendants–Appellees,

v.

**Doña Ana County; The Board of County Commissioners of Doña Ana County; Catalina Development, Inc.; Paseo Del Norte Limited Partnership; Mesilla Bolson Properties; Checkpoint Limited Partnership; Santa Teresa Land Co.; Santa Teresa Limited Partnership and George B. Powell, individually and on behalf of the Class of Customers of Santa Teresa Services Company,** Defendants–in–Intervention–Appellants.

No. 22,435.

Court of Appeals of New Mexico.

June 2, 2003.

Certiorari Denied, No. 28,166, Aug. 18, 2003.

244

Christopher P. Bauman, Mark C. Dow, Molly B. McIntosh, Bauman, Dow, McIntosh & Leon, P.C., Albuquerque, NM, for Petitioner–Appellee.

Tim J. De Young, Douglas R. Vadnais, Thomas Smidt, III, Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, NM, for Defendants–Appellee Santa Teresa Services Company.

Thomas R. Figart, Las Cruces, NM, for Defendants–in–Intervention Appellants Doña Ana County and The Board of County Commissioners of Doña Ana County.

William R. Babington, Jr., Mila Allen Maturan, Holt & Babington, P.C., Las Cruces, NM, Frank S. Ainsa, Jr., Ainsa Partners, LLP, El Paso, TX, for Defendants–in–Intervention Appellants Mesilla Bolson Properties; Catalina Development, Inc.; El Mirador Limited Partnership; and Santa Teresa Associates Limited Partnership.

Donald M. Salazar, Brenden J. Murphy, Rubin, Katz, Salazar, Alley, Rouse & Herdman, P.C., Santa Fe, NM, for Defendants–in–Intervention Appellants Checkpoint Limited Partnership; Santa Teresa Limited Partnership; Paseo Del Norte Limited Partnership; Santa Teresa Land Company; George B. Powell, individually and on behalf of the Class of Customers.

## OPINION

BUSTAMANTE, Judge.

{1} Originally filed in 1996, this vigorously litigated eminent domain case arrives on this Court's doorstep laden with potentially difficult substantive and procedural issues surrounding condemnation actions in New Mexico. We affirm, finding that the Appellants are not "condemnees" within the meaning of the Eminent Domain Code, and therefore do not have standing to argue the issues raised on appeal.

### THE PARTIES

{2} The condemning authority is the City of Sunland Park (the City), a New Mexico municipal corporation located at the southern end of Doña Ana County on the border with Mexico. The City prevailed below as to the

condemnation and appears before us as an Appellee.

{3} The City sought to condemn certain physical assets and contract rights belonging to Santa Teresa Services Corporation (the Utility). The Utility provides water and sewer services in an unincorporated area of Doña Ana County abutting the City and commonly known as Santa Teresa. The Utility never contested the City's condemnation effort in the district court except with regard to valuation of the assets taken. The Utility has not appealed the valuation judgment and appears in this Court aligned with the City against the Appellants working to preserve the judgment. We thus treat the Utility as an Appellee. We reject the assertion by some Appellants that the Utility is not a proper party to this appeal. The Utility obviously has a direct interest in protecting the judgment awarding Utility an amount that it views as fair compensation for the assets taken by the City. Further, the notice of appeal filed by the majority of the Appellants generally challenged the district court's orders and did not attempt to limit the appeal process to the City's interests.

{4} The Utility appears jointly with Bernard R. Given, the Chapter 7 Trustee for the bankruptcy estate of Phyllis Crowder, (the Trustee). It is undisputed that Phyllis and Charles Crowder at one time owned all of the shares of stock of the Utility as community property. Phyllis filed for bankruptcy in January 1996, and Charles filed for bankruptcy in April 1997. Phyllis' bankruptcy case was converted to a Chapter 7 proceeding prior to the trial on the merits. As a result of the bankruptcies, the Trustee became the sole shareholder in the Utility.

{5} As a privately owned entity, the Utility was subject to the regulatory jurisdiction of the Public Utility Commission (PUC), NMSA 1978, Sections 62–6–4 to –26.1 (2003) and its successor, the Public Regulation Commission (PRC), NMSA 1978, Sections 8–8–1 to –21 (1998, as amended through 2001). The PRC intervened in the district court action and participated somewhat sporadically, finally withdrawing from the condemnation portion of the case on February 18, 2000, prior to trial. PRC has not appealed and is not a party before us in this case.

{6} Appellant, Board of County Commissioners of Doña Ana County (the County) is, of course, a political subdivision of the State of New Mexico. The City and the physical property subject to condemnation are located within the County's boundaries. The County intervened in the district court action asserting a tax lien against the Utility in the sum of $124,000.

{7} The other Appellants can be fruitfully organized in relation to their claims against the Utility. To the extent possible we will refer to them collectively as the Landowners, the Customer Class and the Catalina Group. As clarity demands, we will use individual entity names.

{8} The Landowners are development entities with land holdings in the Santa Teresa area. The Landowners entered into service agreements with the Utility in which the Utility agreed to provide water and sewer service to their properties when development actually began. The Landowners include Paseo Del Norte Limited Partnership (Paseo), Checkpoint Limited Partnership (Checkpoint), Santa Teresa Land Company (STLC), and Santa Teresa Limited Partnership (STLP).

{9} The Customer Class consists of customers of the Utility who had paid utility expansion charges (UEC) deposits to the Utility and claimed a right to reimbursement. The Customer Class was certified pursuant to Rule 1–023(B) NMRA 2003, early in the litigation. The class consisted of approximately 300 customers. The current class representative is George Powell.

{10} The final group of Appellants will be commonly referred to as the Catalina Group, though its interests are not as homogenous as the Landowners. The Catalina Group includes Catalina Development, Inc. (Catalina); Mesilla Bolson Properties, LLC (Mesilla); El Mirador Limited Partnership (El Mirador); and Santa Teresa Associates Limited Partnership (Santa Teresa Associates). El Mirador and Santa Teresa Associates originally entered the litigation separately from Catalina and Mesilla. Apparently hav-

ing acquired their interests, however, Catalina later moved to substitute itself for El Mirador and Santa Teresa Associates as the real party in interest. In this Court, Catalina and Mesilla call themselves successors-in-interest to the claims of El Mirador and Santa Teresa Associates. The Catalina Group claims ownership of two wells taken by the City in the condemnation.

## FACTUAL AND PROCEDURAL POSTURE

{11} On August 16, 1996, the City filed a "Petition for Condemnation and Request for Court Order Permitting Entry for Suitability Studies" (the Petition). The Petition named as defendants the Utility, Catalina, the County, and a number of other persons who are not parties on appeal. The Petition described three categories of Utility property to be condemned: (1) the "Water Utility," (2) the "Sewer Utility," and (3) the "Purchased Water Agreement." The sewer and water assets described were items of real and personal property used in the normal course of business by the Utility. The items were more particularly described in exhibits to the Petition, including specific references to Well Nos. 6, 8, 19, 30, and 31. The Purchased Water Agreement was the Utility's contractual arrangement with Charles and Phyllis Crowder for the purchase of water, and consisted of a basic agreement dated January 1987 and two subsequent amendments. At the time the Purchased Water Agreement was signed, Charles and Phyllis Crowder owned all of the shares of stock of the Utility.

{12} The Utility filed its answer to the Petition on August 26, 1996, generally denying the allegations, asserting that the description of assets was incomplete and inaccurate, and requiring that fair market value be established. At the same time, the Utility filed a motion to strike seeking to dismiss all of the other named defendants from the case, asserting that no one other than the Utility owned, occupied or had recorded a claim against the property described in the Petition. An order granting the motion to strike was entered the same day.

{13} Also on August 26, 1996, City and Utility signed, submitted and had entered a stipulated judgment and decree. The stipulated judgment broadly provided that the City would receive the property described in the Petition, plus certain accounts receivable in the sum of $74,416 plus UEC payments "received and receivable." In exchange, the City would pay the Utility's indebtedness in the amount of $297,746. The indebtedness excluded the UEC liability. In addition, the City agreed to assume the Utility's obligations under eight agreements with various entities to provide water and sewer service in the future.

{14} Within a few days after entry of the stipulated judgment, Appellants began filing motions to intervene, challenging the judgment specifically, and the condemnation generally. El Mirador and Santa Teresa Associates (now part of the Catalina Group) were the first to file their joint motion to intervene. Their motion and attached proposed counterclaim in intervention asserted:

a. The stipulated judgment was illegal and a sham because it was no more than a voluntary sale by the Utility without notice to or the permission of the PUC, contrary to Sections 62–6–4, 62–6–5, 62–6–12(A)(4), 62–6–13, 62–6–19, and NMSA 1978 § 62–9–5 (1983).

b. The sale/condemnation was motivated largely, if not solely, by the Crowders' desire to evade imminent PUC regulatory and enforcement action in PUC Case No. 2494, as detailed in the PUC Hearing Examiner's Recommended Decision, which was attached as an exhibit.

c. The stipulated judgment was contrary to the automatic stay imposed pursuant to Phyllis Crowder's bankruptcy and was unenforceable without the consent of the Bankruptcy Court.

d. The structure of the judgment was "meaningless" because PUC had determined that the water Charles Crowder agreed to sell to the Utility were already assets of the Utility.

e. The stipulated judgment did not adequately address their specific interests, which included (a) their right to receive water and sewer service, (b) return of $94,000 improperly collected and applied by the Utility, (c) Santa Teresa Associ-

ates' interest in an unexercised option to buy part of the Utility, and (d) the right to have the PUC be the regulatory body overseeing the Utility.

{15} Catalina's motion appears next in the record and asserts the same general concerns about the effect of Phyllis Crowder's bankruptcy. In addition, Catalina notes that it was originally a named party but was never served pursuant to a "sub rosa agreement" between the City and Utility. Catalina also attached a copy of a complaint it was filing in the bankruptcy court to "Enjoin Exercise of Control Over Property and to Declare" the stipulated judgment void. The bankruptcy court complaint includes a detailed corporate history of the Utility, including the development of Charles and Phyllis Crowder's stock ownership.

{16} Paseo and Checkpoint (two of the Landowners) moved to intervene and set aside the judgment on the same day. They asserted that the City would be unable to fulfill certain water and sewer service agreements they had with the Utility which the City had agreed to assume. Checkpoint incorrectly asserted that its service agreement was not among those identified in the stipulated judgment. Paseo and Checkpoint alleged that there might not be sufficient water actually available to satisfy all the demands inherent in the various service agreements. In addition, Paseo and Checkpoint raised a factual question, based on contradictory testimony before the PUC, as to whether the Utility owned the five wells it conveyed to the City. Paseo and Checkpoint did not assert ownership of the wells themselves.

{17} The Landowners filed a supplemental motion to intervene a few days later. The supplemental motion added STLC and STLP to the motion, further detailed the basis of their request for intervention, and attached a proposed complaint. In these additional pleadings, the Landowners (a) elaborated concerning their contract rights under their service agreements, including their right to PUC regulation of the Utility; (b) charged that the condemnation was a sham (similar to El Mirador's position); and (c) questioned the City's legal authority to condemn the property, including the City's declaration of public use and necessity for the assets.

{18} The County's motion to intervene asserted that its ability to collect its taxes was not adequately protected by the stipulated judgment and otherwise repeated the assertions of fraud, misrepresentation, and misconduct made by the other intervenors.

{19} The Customer Class's motion to intervene asserted that the Utility had collected approximately $118,000 in UEC deposits from the members of the Customer Class, and that their interests were not adequately protected by the stipulated judgment. Specifically, the Customer Class asserted that while the UEC funds appeared to be transferred to the City, the City refused to accept any liability with respect to them, thus leaving the Utility with a liability but no assets. The Customer Class also questioned the City's assertion of public use and necessity, asserting that its members would be adversely affected by the City's operations of the Utility.

{20} Citing its administrative responsibility and regulatory power over public utilities, the PUC also sought to intervene.

{21} The City responded to the Landowners, Catalina, and County motions by arguing—among other things—that they did not have standing because none of the interests they asserted were property interests as contemplated by the Eminent Domain Code and, thus, they were not condemnees under the Code or otherwise. The Utility rather tepidly responded to the motions to intervene. Rejecting the City's and Utility's objections, the district court granted all of the motions to intervene and set aside the stipulated judgment on October 22, 1996.

{22} The intervenors' answers and counterclaims to the condemnation petition reiterated their objection to the proceeding. Once added as parties, the Appellants participated fully in the litigation, addressing all the issues raised in the case and engaging in extensive discovery measures. The issue of Appellants' standing did not come to the fore again until early in 2001 as the trial on the merits approached and decisions were made about conduct of the trial.

{23} In the two and one-half years interim following Appellants' intervention, the district court made a number of decisions which Appellants now want to challenge. First, the district court granted the City's second motion for partial summary judgment as to its right to condemn. The effect of this ruling was to foreclose further litigation as to the City's statutory authority to condemn and the issue of public use and necessity. However, in the same order the district court ruled there was still a question of fact whether the transaction was a voluntary sale or a contested statutory condemnation, and thus reserved the issue of PRC jurisdiction over the matter. The district court later also denied the Utility's motion for summary judgment on the issue of PRC jurisdiction.

{24} Second, following an evidentiary hearing, the district court ruled that the Utility was the equitable owner of 2500 acre feet of water per year (2500 AFY) of water rights and that these water rights should be included in the assets being condemned.

{25} Third, the district court ruled that it would bifurcate the issues of whether the transaction was a disguised sale or a bona fide statutory condemnation from other issues in the case and that this issue would be tried first. In conjunction with this decision, the district court also ordered that even if the jury found the condemnation to be a sham, dismissal of the City's petition was not required and the City would have the option to proceed with a second, contested condemnation trial addressing valuation issues. In response, the City and the Utility each repudiated all prior stipulations between them as to value and asked that the trial to determine whether the condemnation was a sham be canceled as moot. The district court agreed with the request, vacated the sham trial, and instead scheduled a bifurcated trial dealing with asset valuation issues first and proceeds allocation issues second.

{26} In an apparent effort to clarify the district court's various decisions concerning conduct of the trials, Appellants later moved for entry of a "Final Order on Dismissal as Remedy" and as to their status as condemnees. The district court entered an order reiterating its decision that dismissal was not an appropriate remedy even if a sham condemnation were found by a jury, and thus no trial on the issue was needed.

{27} Fourth, because the City intended to continue operating the condemned property as a utility, the district court decided that it would be valued as a "going concern." The effect of this ruling was to require that the City would assume responsibility for all liabilities and obligations connected with all of the assets it was taking.

{28} As trial on the merits approached, the district court focused more closely on the Appellants' asserted interests in the Utility and the condemned property. The district court dismissed claims for payments for utility easements made by Catalina, Santa Teresa Associates, Mesilla, and El Mirador. The district court also determined that the Landowners, Customer Class, and the County did not have standing to participate in the valuation trial because their claims did not rise to the level of an ownership interest in the condemned assets. In the words of the Eminent Domain Code, the district court decided they should not be considered "condemnees." Their claims only attached to the proceeds of the condemnation and they could only participate in the allocation phase of the trial.

{29} Catalina and Mesilla made a claim of actual ownership of Wells 8 and 19 following settlement of their claims against the Crowders in the bankruptcy proceedings. After two rounds of briefing, the district court ruled there was "no genuine issue of material fact regarding ownership of wells 8 and 19 and the ownership claim asserted by Catalina Development Inc. and Mesilla Bolson Properties is without merit."

{30} The case proceeded to trial on valuation on April 24, 2000. The jury returned a verdict of $2,000,000. The bankruptcy court approved the verdict and judgment in October 2000. Arguments concerning the proper form of judgment to be entered on the verdict delayed entry of a final valuation judgment until December 19, 2000. A separate order called "Condemnation Judgment" was entered on November 8, 2000, in response to a joint motion by the City and Utility for a "Permanent Order of Entry." The district

court finally entered an "Amended Condemnation Judgment Nunc Pro Tunc" on January 19, 2001, incorporating an agreement between the City and the Utility providing for payment of the judgment, interim operation of the condemned assets, and eventual full possession by the City. Under the agreement, the City and the Utility understood the City was required to pay the judgment amount into the court registry by May 24, 2001.

{31} Following the valuation trial, the Landowners, the Customer Class, the County, and STLP reached stipulated settlements with the Utility and the Trustee concerning their claims against the condemnation fund and the Utility. The settlement agreements all provided for broad mutual releases of all claims between the Utility, the Trustee and Appellants. However, each of the claimants explicitly reserved all claims against the City. The settlements were incorporated into a "Judgment Concerning Allocation Trial" entered May 25, 2000.

{32} The City did not immediately pay the judgment amount, and the Appellants sought an order requiring deposit of the funds into the court registry with the provision that the agreed settlement figures would receive priority in disbursement. The district court entered an order tracking the Appellants' motion essentially word-for-word.

{33} Thereafter the parties engaged in a complicated—if not dizzying—array of maneuvers involving the City's funding of its obligation to pay the judgment. The details of that litigation are not directly relevant to this appeal. Suffice it to say that funds were finally deposited with the court registry. On June 15, 2001, the Utility and Trustee moved for an order allowing disbursement of the funds, or in the alternative, a finding that the City had not performed under its Agreement Regarding Condemnation, thus allowing the Utility to declare the condemnation abandoned. On July 6, 2001, the district court entered its Order Authorizing Disbursement of Funds, and this appeal ensued.

{34} Because the County is one of the Appellants, the district court's orders were automatically stayed and the funds remain in the court registry to this day. NMSA 1978, § 39-3-23 (1966), Rule 1-062(E) NMRA 2003.

## ISSUES

{35} Appellants raise a number of similar challenges to the district court's procedural and substantive decisions, including:

a. Whether the district court improperly granted the City summary judgment as to its authority to condemn, thus depriving Appellants of a jury trial on the basic issues of public use and necessity.

b. Whether the district court was wrong in refusing to submit the issue of a "sham" condemnation to the jury.

c. Whether the district court was wrong to include 2500 AFY of water rights as part of the Utility assets being condemned.

d. Whether the district court wrongly decided that Appellants were not condemnees under the Eminent Domain Code and thus did not have standing to participate in the valuation trial.

{36} As interesting as issues a, b, and c may be, we should not resolve them if Appellants do not have individual standing to raise them. Appellants' individual standing depends on the nature of their interest in the litigation, which in turn depends on their "interest" in the condemnee Utility.

{37} Certain Appellants also ask us to review the district court's refusal to address the legality of the City's financing arrangements. We decline to address this issue. We agree with the district court that the issue was not properly before it when the appeal was perfected and would be better presented in a different forum.

{38} The Catalina Group also challenges the district court's refusal to honor an excusal filed against him in May 2001.

## STANDING

### Standard of Review

{39} Whether a party has standing to litigate a particular issue is a question of law, which we review de novo. *Forest Guardians v. Powell*, 2001–NMCA–028, ¶ 5, 130 N.M. 368, 24 P.3d 803. A party's standing, of course, depends on its factual and legal connection to the issue it wishes to

litigate. If the standing decision is made on the pleadings in response to a motion to dismiss, we accept as true all material allegations of the complaint—or here, counterclaim—and construe the complaint in favor of the complaining party. *Id.* However, if additional facts are presented, the standard of review appropriate to the procedural posture in which the ruling is made should be applied.

### General Rule

■■ {40} To acquire standing to litigate a particular issue, a party must demonstrate " '(1) an injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable decision.' " *John Does I through III v. Roman Catholic Church of the Archdiocese, Inc.,* 1996–NMCA–094, ¶ 25, 122 N.M. 307, 924 P.2d 273 (quoting *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.,* 517 U.S. 544, 551, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996)). Even where a party demonstrates these three elements, standing may be denied if the interest the complainant seeks to protect is not within the "zone of interests" protected or regulated by the statute or constitutional provision the party is relying upon. The concepts of injury and zone of interest are thus intertwined.

■ {41} Cases in New Mexico are clear that injury—whether actual or threatened—is not enough by itself to confer standing. To be accorded standing on a particular issue the party must show that the statute or constitutional provision relied on reaches or provides protection against the injury. *See Key v. Chrysler Motors Corp.,* 121 N.M. 764, 772–774, 918 P.2d 350, 358–60 (1996) (holding that a motor vehicle dealer did not have standing to sue a manufacturer for allegedly unreasonably withholding consent to transfer dealership franchise because the statute the dealer relied on for relief was not intended to provide protection against the loss of an opportunity to acquire an additional franchise).

{42} In light of these principles, we focus our inquiry on the "zone of interest" sought to be protected by condemnation law, including the New Mexico Constitution, the Eminent Domain Code, and case authority describing the nature of eminent domain. Identification of the interests protected in condemnation proceedings will allow us to determine the extent to which Appellants asserted interests may be appropriately addressed in a condemnation action and whether Appellants have suffered injuries which are recognized in condemnation actions.

■■ {43} The power of eminent domain has been deemed a power inherent in the notion of sovereignty and "only limited by the constitutions of federal and state governments." *State ex rel. Red River Valley Co. v. Dist. Ct. of Fourth Jud. Dist.,* 39 N.M. 523, 527, 51 P.2d 239, 241 (1935). The state may appropriate or damage private property under its inherent power of eminent domain without the owner's consent. The primary condition to the exercise of eminent domain is the constitutional requirement to pay just compensation. The requirement to pay just compensation is historically grounded in the common law recognized right of private property. Blackstone's Commentaries make clear that the legislature could compel a property owner to give up his property but only "by giving him full indemnification and equivalent for the injury thereby sustained." 1 William Blackstone, Commentaries at 139.

■ {44} The New Mexico Constitution addresses the power of eminent domain in two provisions. Article II, Section 18 provides that "[n]o person shall be deprived of life, liberty or property without due process of law," and Article II, Section 20 provides that "[p]rivate property shall not be taken or damaged for public use without just compensation." The "or damaged" provision of Section 20 serves to allow compensation even when an actual taking has not occurred. *Bd. of County Comm'rs v. Harris,* 69 N.M. 315, 317, 366 P.2d 710, 711 (1961) (holding that depreciation in land value caused by a material change in a highway grade which made access to the property difficult is compensable). *But see Pub. Serv. Co. v. Catron,* 98 N.M. 134, 136, 646 P.2d 561, 563 (1982) (holding that in order to be compensable, consequential damages must affect some right or interest that is "different in kind, not merely

in degree, from that suffered by the public in general").

{45} The legislature has granted municipalities the power to acquire water and sewer facilities located within or without their boundaries by condemnation. NMSA 1978, § 3–26–1 (1994); NMSA 1978, § 3–27–2 (1994). Municipal condemnations must follow the requirements of the Eminent Domain Code. *See* § 3–26–1(C) and § 3–27–2(D)

{46} The Eminent Domain Code, NMSA 1978, § 42A–1–1 to –33 (1981) (the Code) sets the procedure to be followed in all condemnation actions conducted in New Mexico. The Code makes provision for the usual direct action by an authorized "condemnor." Section 42A–1–2(C). The Code also provides a remedy for "inverse condemnation" allowing persons to institute actions for taking or damages against persons "empowered by law to condemn." Section 42A–1–29; *McClure v. Town of Mesilla*, 93 N.M. 447, 448, 601 P.2d 80, 81 (Ct.App.1979) (noting that inverse condemnation is a statutory remedy and not a common law tort).

{47} Section 42A–1–17 prescribes the contents of the petition for condemnation filed with the court. Section 42A–1–17(D) requires that the petitioners name as defendants "all the parties who own or occupy the property or have any interest therein as may be ascertained by a search of the county records" and also provides for the handling of interests held by minors, persons under legal disabilities, estates, trusts, and a catch-all "unknown owners or claimants of the property involved." Section 42A–1–17(D)(4) (internal quotation marks omitted). Section 42A–1–2(B) defines "condemnee" as a "person who has or claims an interest in property that is the subject of a prospective or pending condemnation action."

{48} Not unexpectedly, none of these provisions addresses the standing of any particular party in a condemnation action. The nature of eminent domain and its historical roots lead us to conclude that the zone of interest sought to be protected is the right of private property and compensation for its expropriation or for damage to an interest in property. As such, only persons with an ownership interest capable of being taken or damaged would appear to have standing to raise issues about the basic features of such an action, such as the authority of the condemnor to proceed, the identity of the fact finder, and the description of the property or its value. Persons with non-ownership interests in the property being taken or damaged could not claim a general right to litigate these basic issues; they would be limited to the issues implicated by their interest.

{49} All of the Appellants urge a broad interpretation of the term "interest" in the Code definition of "condemnee." Appellants' position is that under *De Vargas* any articulable interest in the outcome of the case should be sufficient to confer general standing. 87 N.M. at 472, 535 P.2d at 1323 ("It seems fundamental that a plaintiff has standing to protect himself against injury as a result of unlawful governmental action, even in the absence of a controlling statute or constitutional provision."). The Customer Class and the County are making claims against the proceeds of the condemnation award. These Appellants argue that under the joinder rules of the rules of civil procedure they are proper parties to the action even if they cannot claim the status of "owner." Thus, they argue, they should be allowed to participate to the fullest extent they desire. Rule 1–019 NMRA 2003. We disagree with both assertions.

{50} The structure of the Code reflects the constitutional concern for the protection of ownership interests in property and argues against the notion that all persons subject to joinder in a condemnation action are necessarily "condemnees." For example, Section 42A–1–4 encourages the condemnor and condemnee to negotiate an acceptable acquisition price. No one other than an owner with the ability to convey title could be expected to effectively negotiate to a sale. Similarly, only an owner could authorize the condemnee's appraisal contemplated by Section 42A–1–5. Only an owner could waive compliance with the negotiation and appraisal requirements of Section 42A–1–7(A). Only an owner (or someone in "actual physical possession") could consent to the condemnor's entry onto property for suitability studies.

*See* §§ 42A–1–8 and –9. Only owners (or persons in actual physical possession) could claim damages for physical injury to or interference with use of property caused by suitability studies. *See* § 42A–1–12. And, only an owner could withdraw funds deposited by the condemnor and thereby waive "all objections and defenses to the condemnation action, except for any claim to greater compensation." § 42A–1–19(E) and (F).

■ {51} In each of these examples of Code procedure, parties with debt claims against the property owner, whether unsecured or recorded, could not meaningfully participate as "condemnees." Rather, parties with such claims must rely for relief on the allocation proceedings conducted under Section 42A–1–24(C). Having a claim against the proceeds of a condemnation action may unquestionably give a party a practical "interest" in the condemned property, but by itself is not sufficient to transform the party into a "condemnee" within the meaning of the Code. The Code helps protect parties with claims against the owner of property being condemned by facilitating their joinder, but that does not make such a party a condemnee on an equal footing in the litigation with the owner.

■ {52} Further, *DeVargas* did not dispense with the requirement that a party identify an injury which is entitled to legal protection. To the contrary, we have recently affirmed that the *DeVargas* approach includes this basic requirement. *See John Does I through III,* 1996–NMCA–094, ¶¶ 16–30, 122 N.M. 307, 924 P.2d 273. Appellants' approach would turn condemnation actions into general referenda on the wisdom of the taking. That is not the function of condemnation actions. In its essence a condemnation action is a proceeding in rem to appropriate property and pay for it, creating a new title in the process. *United States v. 25.936 Acres of Land,* 153 F.2d 277, 279 (3rd Cir. 1946); *see City of Crystal Lake v. LaSalle Nat'l Bank,* 121 Ill.App.3d 346, 76 Ill.Dec. 728, 459 N.E.2d 643, 649 (Ill.App.Ct.1984)

(rejecting the assertion that an adjoining municipality has the same right as a landowner subject to condemnation "to insist on strict compliance with all of the provisions of the condemnation statute").

■ {53} In concert with other courts across the country, we determine that ownership of a recognized property interest in the property taken or damaged is what makes a party a "condemnee" within the meaning of Section 42A–1–2(B) of the Code. In turn, status as condemnee is what gives a party standing to challenge the condemnation.[1] *E. Thirteenth St. Cmty. Ass'n v. New York State Urban Dev. Corp.,* 84 N.Y.2d 287, 617 N.Y.S.2d 706, 641 N.E.2d 1368 (1994) is instructive. There, the New York Court of Appeals held that neighbors did not have standing under the zone of interest test to challenge the condemnation of a nearby property even under a statutory provision that allowed judicial review of condemnation at the behest of persons "aggrieved" by the action. *Id.* at 1370. This language was included in a new eminent domain code enacted by the New York legislature in 1977. In reviewing the legislative history of the statute, the New York court noted that one of its purposes was to increase "public participation in the planning of public projects necessitating the exercise of eminent domain." *Id.* (internal quotation marks and citation omitted). The court held that these provisions did not alter the historical rule so as to extend standing to noncondemnees in judicial condemnation proceedings.

{54} Under a separate, specific provision of the statute, the New York court held that noncondemnees could enforce New York's Environmental Quality Review Act in the condemnation proceeding. *Id.* at 1372. New Mexico has no comparable provision, and Appellants do not argue that any other statutory provision of State law outside the Code confers general standing in them.

{55} Other cases are similarly clear on the importance of ownership in determining standing in condemnation. *See Haldeman v.*

---

1. A governmental entity such as the PRC might have an independent basis for intervention to challenge the bona fides of a condemnation of an entity it regulates based solely on its regulatory responsibility. We need not explore the contours of that issue, however, since the PRC withdrew its objection to the condemnation below, did not appeal and is not a party here.

*Freeman,* 558 F.Supp. 514, 518 (D.D.C.1983) (noting it is "axiomatic" that a plaintiff must show an ownership interest in property to seek compensation and that only an owner of targeted property has standing to object to condemnation proceedings); *United States v. Certain Lands in Town of Highlands,* 48 F.Supp. 303, 305 (S.D.N.Y.1942) (denying intervention by municipality based on its general concern for its citizens because it did not have any ownership interests in the property being taken); *City of Dania v. Broward County,* 658 So.2d 163 (Fla.Dist.Ct.App.1995) (denying city's motion to intervene in a county-initiated condemnation action on the basis of loss of tax base and prior infrastructure improvements because there was no basis for recovery by the city for such damages); *Lake County Forest Pres. Dist. v. First Nat'l Bank,* 213 Ill.App.3d 309, 157 Ill.Dec. 96, 571 N.E.2d 1115, 1117 (1991) (allowing intervention by city because it owned utility easements running through property being taken, but denying school district intervention based on mere proximity of a junior high school and loss of tax base); *Pub. Util. Dist. No. 1 v. Kottsick,* 86 Wash.2d 388, 545 P.2d 1, 2 (1976) (en banc) (denying abutting landowners claim for inverse condemnation for aesthetic damage to their property because interference with view is not a taking requiring just compensation, and as a consequence denying them standing to challenge the condemnation because they were not condemnees).

{56} Having set the basic structure of the analysis, we now turn to the specific circumstance of each of the Appellants. They present different claims and circumstances which are best dealt with discretely. As we consider the Appellants in turn, we keep in mind that standing can be clarified and determined as facts are determined in the course of the litigation. *State ex rel. State Highway & Transp. Dep't v. City of Sunland Park,* 1999–NMCA–143, ¶ 12, 128 N.M. 371, 993 P.2d 85 (noting that facts developed in the case clarified a party's— Paseo Del Norte's—lack of standing).

**The County**

{57} The County made a claim for unpaid taxes. Unknown at common law,

tax liens are imposed by statute to help ensure payment of the taxes. The general property tax lien statutes are NMSA 1978 §§ 7–38–47 (1973) and –48 (1974). These statutes make clear that while a lien is imposed, the tax liability remains a personal obligation of the taxpayer. Further, the tax lien can only be enforced by sale of the property or personal collection action. NMSA 1978, §§ 7–38–65 to –71 (1973, as amended through 2001) and § 7–38–62 (1990). The statutory tax lien does not "endure after the expiration of the interest of the party against whom the lien was filed." *MGIC Mortgage Corp. v. Bowen,* 91 N.M. 200, 202, 572 P.2d 547, 549 (1977). Further, liens do not serve to transfer title to property. *Mills v. Reneau,* 411 P.2d 516, 519 (Okla. 1965). In this regard, tax liens are similar to mortgage liens in that they pass no title and merely provide a method for collection of the debt. *See Slemmons v. Massie,* 102 N.M. 33, 34, 690 P.2d 1027, 1028 (1984).

{58} We hold that tax liens in New Mexico do not create an ownership interest in the sense required by the Code. Thus, the County is not a condemnee and does not have standing to raise and argue any of the issues it advances here. We agree that the County was properly joined as a creditor of the Utility and it had the right to protect its claim by pursuing the proceeds of the condemnation. But, its status as a creditor and a party to that extent did not make it a "condemnee."

{59} The County also argues that apart from its status as a condemnee, it has standing as a "party-in-interest ... on behalf of its [own] utility interests and its citizenry." In fact, in a reply brief, the County characterizes its tax claim as a "conditional counterclaim" and describes its "primary interests" as (1) prevention of economic injury to itself as a result of competition from the City with the County's as yet undeveloped utility, and (2) its concern for its citizens.

{60} We have already noted that condemnation actions are designed to ensure payment of just compensation to the owners of appropriated or damaged property. We see

no basis in the Code to allow the type of broad litigation the County has in mind. The County's "primary interest" is not compensation, but raw economic competition and a wide ranging review of what is "best" for the community. These goals are simply not within the zone of interests protected by the Code. The authority from other states is in accord with our view. *City of Dania*, 658 So.2d at 163; *Lake County Forest Pres. Dist.*, 157 Ill.Dec. 96, 571 N.E.2d at 1115; *City of Crystal Lake*, 76 Ill.Dec. 728, 459 N.E.2d at 643; *see also State ex rel. State Highway Comm'n v. Hudspeth*, 303 S.W.2d 703, 705 (Mo.Ct.App.1957) (per curiam) (municipality had no right to intervene in condemnation action based on its assertion that the public interest, safety and welfare of the citizens was at stake); *City & County of Denver v. Bd. of Comm'rs*, 113 Colo. 150, 156 P.2d 101, 108 (1945) (holding that a neighboring county had no standing to raise the question of the necessity for the rise of a proposed taking based on its loss of a tax base).

{61} The County's reliance on *Town of Mesilla v. City of Las Cruces*, 120 N.M. 69, 898 P.2d 121 (Ct.App.1995), a zoning case, is unavailing. Zoning provisions have an entirely different zone of interest they seek to protect. As the court in *East Thirteenth Street Community Ass'n* noted when analyzing the same argument:

> There are notable differences between zoning statutes and eminent domain proceedings, which make clear that petitioners are not within the zone of interest contemplated by the EDPL. Standing in zoning cases is a broader concept because zoning statutes seek to protect "the welfare of the entire community," by making a balanced and effective use of the available land and providing for the public need for varying types of uses and structures. In contrast, eminent domain statutes seek primarily to protect the interests of property owners and to ensure that their property is taken only in accord with proper procedure and for just compensation.

617 N.Y.S.2d 706, 641 N.E.2d at 1371 (internal quotation marks and citations omitted). We agree with these observations.

## The Customer Class

{62} The Customer Class' interest in the case was their claim for reimbursement of UEC deposits paid to the Utility. On the face of it, the UEC deposits appear to be simple liabilities of the Utility. The Customer Class does not characterize them differently and does not argue that their reimbursement claim creates any sort of ownership interest in the Utility; and, we cannot conceive of a colorable theory that could support such a claim. As such, the Customer Class' only claim is to a share of the condemnation award under Section 42A–1–24C. The Customer Class was allowed to participate fully in the allocation trial. They chose to settle their claims for a sum certain. There is no showing that if the judgment is affirmed and the funds released, the Customer Class will receive less than full compensation.

{63} The Customer Class argues that the valuation judgment did not explicitly mention the UEC deposits either as an asset or a liability. We note that the Customer Class never made this argument below and it is not preserved. *Woolwine v. Furr's, Inc.*, 106 N.M. 492, 496, 745 P.2d 717, 721 (Ct.App. 1987). In any event, the matter is of no consequence given the Customer Class' opportunity to prove their claim and their voluntary settlement of the issue.

{64} The Customer Class also makes an argument—not made below—that the district court's order including 2500 AFY of water rights as an asset subject to condemnation gave them an ownership interest in the water. The order stated that the water rights had been "equitably owned by [the Utility] and its customers since the inception of the utility." The Customer Class' resort to this argument is slightly ironic given their vehement argument below against inclusion of the water rights as an asset.

{65} Regardless, we do not agree with the assertion. The district court's findings of fact on the issue make clear that its decision was based on prior orders of the PUC granting the Utility a Certificate of Convenience and Necessity expressly conditioned on the transfer of assets including water rights from the Crowders. The district court concluded

that the Utility owned legal title to the water rights pursuant to the PUC orders even though the Crowders had yet to formally transfer them. The district court also concluded that the Utility customers, current and future, had an equitable right to use of the water. The district court's findings and order recognize an obligation on the part of the Utility to put its water at the disposal of its customers as a contractual right and as an obligation flowing from its status as a utility. The findings and order do not create an ownership interest in the water per se. Certainly the Customer Class would not be able to make any claim of just compensation individual to themselves based on the inclusion of the water rights as an asset.

### The Landowners

{66} The Landowners all assert claims based on similar agreements to supply water and sewer services they had entered into with the Utility (the Supply Agreements). Though not literally identical, the Supply Agreements all essentially provide that the Utility will supply a minimum amount of water per unit of land (along with associated sewer service) to the Landowners' proposed developments if and when development occurs. The City sought to take the Utility's interest in the Supply Agreements. The Landowners' theories of damage are that (1) the City will not be able to perform under the Supply Agreements, (2) transfer of the Supply Agreements was a breach of the Utility's obligations because the Landowners' consent was not sought, and (3) the Landowners will lose the benefit of PRC regulation of the Utility. The second theory of damages is tied to the assertion that the transaction between the City and Utility was a voluntary sale—a sham condemnation rather than a real condemnation.

{67} The Landowners do not argue that their position as contracting parties under the Supply Agreements gives them any ownership in the Utility. Their claims can only be maintained as an inverse condemnation; that is, that the proposed taking adversely affects their property interests in the Supply Agreements. This is, in fact, how the Landowners pled the claim below.

{68} The City moved, pursuant to Rule 1–012(B)(6) NMRA 2003, to dismiss the Landowners' counterclaims for failure to state a claim upon which relief could be granted. The Utility joined in the City's motion. The City and the Utility basically argued that the Landowners could not demonstrate any injury as a result of the taking because: (1) the City had agreed to accept responsibility for the Supply Agreement obligations, and (2) none of the conditions precedent to the Supply Agreements—such as any actual development by the Landowners—had occurred. The Landowners did not argue below or here that the conditions precedent had been met.

{69} The district court denied the motion to dismiss pending "further clarification whether a factual dispute exists." In the same letter, the district court decided that the Landowners did not have standing to participate in the valuation trial.

{70} On appeal, the Landowners continue to argue the same concerns as to the possible adverse effects of the City taking the Supply Agreements. But, their claims are just that: assertions of potential damage, not damage which has occurred. There is no argument that the City has or intends to repudiate the Supply Agreements. Beyond speculation, there is no indication how the potential supply of water may be affected. Taking the Landowners' position at face value, they do not allege any compensable injury at this time. In this regard, the Landowner's inverse condemnation claim is not ripe for litigation.

{71} Further, the mere replacement of the Utility by the City as the supplier of utility services is not a compensable consequence of the taking. Rather, it is a classic example of the incidental frustration of the performance of a contract which is, as a matter of law, not compensable. *Omnia Commercial Co. v. United States,* 261 U.S. 502, 507–08, 43 S.Ct. 437, 67 L.Ed. 773 (1923) (determining that no taking of a contract occurred when the government appropriated the entire output of a steel plant making it impossible to fill other orders). Here, the contract right remains intact; the only difference is the obligor and the identity of the

regulating agency. *See Tulare Lake Basin Water Storage Dist. v. United States,* 49 Fed Cl. 313, 317–18 (2001) (explaining the operation of *Omnia* in the context of contract takings); *Bd. of Pub. Instruction v. Town of Bay Harbor Islands,* 81 So.2d 637, 639 (Fla. 1955) (refusing damages for breach of restrictive covenants against construction of anything other than residential or hotel properties following condemnation for public school purposes).

{72} The Landowners emphasize as part of their injury the loss of the PRC as the regulatory body overseeing the Utility. However, they do not cite to any authority holding that the continued jurisdiction of any particular regulatory body is in any sense a property right the loss of which is eligible for just compensation. We have not found any authority for this proposition either. We hold that the identity of a regulatory body in a context such as we review here is not a compensable property right.

{73} To summarize, the Landowners' contractual rights under the Supply Agreements have not been repudiated. The condemnation on its face would do no more than replace the Utility with the City. The City would have the same potential access to water to perform the Supply Agreements since the City also took the Utility's position in the Water Purchase Agreement with the Crowders. The PRC would no longer regulate the Utility or the City. This set of circumstances does not implicate any compensable damage to property. The Landowners' claims are not ripe and they do not have standing to litigate the basic issues of the condemnation. *Pub. Serv. Co.,* 98 N.M. at 136–37, 646 P.2d at 563–65 (upholding refusal of intervention in condemnation action by adjacent property on basis that aesthetic considerations, loss of view, interference with television and radio reception and noise and hum were not compensable as a matter of law); *PDR Dev. Corp. v. City of Santa Fe,* 120 N.M. 224, 226, 900 P.2d 973, 975 (Ct.App.1995) (holding that loss of profits from contingent sales contracts were not compensable in inverse condemnation where landowner asserted that zoning action had resulted in loss of a chance to sell the property).

{74} In fact, at this point the condemnation in and of itself does not rise even to the level of frustrating the Landowners' legitimate economic hopes or plans. *See State ex rel. Highway Dep't v. Kistler–Collister Co.,* 88 N.M. 221, 223, 539 P.2d 611, 613 (1975). If, however, the City repudiates its obligation under the Supply Agreements or acts to demonstrably affect its ability to obtain enough water under the Water Purchase Agreement with the Crowders, the Landowners could pursue their claims in another action.

{75} One of the Landowners, STLP stands in a different position. It asserts that it owns existing water and wastewater facilities which are connected to the Utility's system but which it has not dedicated or transferred to the Utility pending negotiation of mutually agreeable terms. This claim was not explicitly included in the Landowners' answer and counterclaim to the Petition.

{76} STLP made its claim known by motion seventeen days before the trial on the merits. The motion asked for an order either excluding STLP's property from the condemnation or allowing STLP to participate in the valuation trial. The district court never entered an order on the record in response to the motion. At a pretrial motions hearing, the district court simply observed that if the City was taking STLP property it would have to value and pay for it. The valuation trial proceeded without STLP.

{77} On the morning scheduled for the allocation trial, STLP first made a claim for inverse condemnation damages. In its brief, STLP asserted that the City's Petition did not include STLP's facilities and, if they were not taken, the facilities would be "physically isolated and nonviable." STLP asserted such isolation would be contrary to NMSA 1978, Section 3–27–3(C) (1994) ("[T]he municipality shall not act so as to physically isolate and make nonviable any portion of the water facilities"). The record is devoid of any facts which would allow us to review this issue.

{78} However, there is nothing about these circumstances which requires reversal of the judgment of condemnation.

There is no requirement in a case such as this that direct condemnation and inverse condemnation claims be tried at the same time. Here, STLP raised its claim extremely late in the proceedings. We see no reason to force the City and Utility to start all over again because a severable inverse condemnation was brought to the attention of the district court at the eleventh hour. Though STLP professes even now not to know if STLP's property has been taken, the record is clear that it has not. There is no hint of STLP property in the language describing the condemned property. As such, STLP may have a potentially viable claim for inverse condemnation, to the extent it has not settled the claim away in the stipulation agreement it entered into in lieu of proceeding with the allocation trial. On remand STLP may proceed to litigate its claim, though the litigation will be limited to injury, damages, and the effect of the settlement. STLP will not be allowed to relitigate or collaterally attack the judgments already entered.

### Catalina Group

{79} The Catalina Group's path to this Court is procedurally curious and requires some explanation in order to provide context for our discussion. Catalina and certain predecessors-in-interest of the Catalina Group, were named as defendants in the original petition, though their interests were not identified. Catalina sought to intervene following entry of the stipulated judgment based on a nonspecific assertion of an interest in the property being condemned. A bankruptcy court complaint filed concurrently with the motion to intervene suggests that Catalina's interest stems from two sources: (1) a damage claim for contamination caused by wastewater discharge by the Utility on its property, and (2) a mortgage foreclosure action against the Crowders personally and a Crowder-owned corporate affiliate of the Utility.

{80} After being allowed to intervene, Catalina filed a simple answer to the petition that did not include any crossclaims against the Utility or counterclaim against the City and did not identify its property interest. The Catalina Group's answer, two and one-half years later, to the amended petition held to the same pattern: no crossclaim or counterclaim and no specific explanation of any property interest.

{81} The Catalina Group also now includes El Mirador and Santa Teresa Associates. In the district court, these two entities variously claimed interests based on UEC payments, easement rights, contamination claims and an "option to purchase" one-half of the assets in the Utility. None of these arguments made below play any role in the Catalina Group's argument on appeal, and we thus treat them as abandoned. *In re Doe*, 98 N.M. 540, 541, 650 P.2d 824, 825 (1982).

{82} In this Court, the Catalina Group relies solely on its claim that it owns Wells 8 and 19. Catalina first asserted this claim in a motion for reconsideration filed February 24, 2000, just two months prior to the scheduled trial on the merits. This motion was prompted by the district court's February 7, 2000, letter ruling informing all of the Appellants that they would not be allowed to participate in the valuation trial. In its motion, Catalina asserted that "since argument on this issue was last raised, Mesilla has determined that it is the owner of personal property in the form of Wells 8 and 19." The exhibits attached to the motion included special warranty deeds executed separately by Charles Crowder and Phyllis Crowder in June 1996 conveying certain described real property to Mesilla. The deed signed by Phyllis specifically excluded "water wells, water rights, or water." Charles' deed did not include the same limitation.

{83} Phyllis' deed was executed as part of a failed settlement attempt in 1996 between Catalina and Phyllis in her bankruptcy proceeding. The circumstances surrounding the failed settlement were made clear in supplemental materials filed by Catalina with the district court on March 10, 2000, and April 7, 2000. After the settlement failed, the matter languished until October 1999. By this time Phyllis' bankruptcy had been converted to a Chapter 7 proceeding. The bankruptcy Trustee moved to enforce the settlement originally set out in a June 1996 letter be-

tween Phyllis and Catalina, making provision for certain mistakes of fact between the parties concerning the state of ownership of some of the real property to be included in the transaction. The bankruptcy court entered an order giving Catalina the option to proceed with the settlement subject to its waiver of the provisions of the letter agreement which could not be complied with. None of the parties assert that the waiver included or affected the wells. Catalina elected to proceed with the settlement on October 25, 1999. There is no indication in the record that new deeds from the Crowders were executed. Thus, transfer of title from the Crowders to any real property included in the settlement was accomplished, if at all, through the 1996 deeds described above.

{84} The district court treated the issue as a summary judgment matter, and in a letter ruling informed the parties that Catalina had not raised a material question of fact as to its ownership of the wells. We agree. As explained in Catalina president Greg Collins' affidavit in support of the motions below, Catalina's claim of ownership is based on two factors: (1) the assertion that the wells are physically located within the exterior boundaries of the real property conveyed to it in the Crowder deeds, and (2) the settlement was intended to convey all "assets ... making up the business of Santa Teresa Country Club." Catalina asserts that the wells were used to water the Country Club golf course in 1995, 1996, and 1998, indicating they belong to the County Club.

{85} As the district court noted, Catalina relies on the June 1996 deeds and the 1996 letter settlement agreement for its claim. The deeds and settlement agreement remained the same when Catalina elected to proceed with the settlement agreement in October 1999. Phyllis' deed expressly excludes water wells from the conveyance. That exclusion stands as an insuperable barrier to Catalina's position unless it can escape it as a matter of law, or unless it can raise a question of fact about its effect or meaning.

{86} In the district court, Catalina relied on Charles Crowder's deed, the 1996 letter settlement agreement itself, and an assertion that the wells were used to water the golf course to argue that a question of fact existed. None of this raises any triable question of fact.

{87} First, the only positive statement in the record concerning ownership of the wells is the PUC's finding that the wells were the property of the Utility. Second, the letter settlement agreement does not mention Wells 8 and 19; it only mentions the transfer of Well 24, which is not involved in this case. Third, the mere fact that the wells watered the golf course, without more raises no issue concerning ownership of the wells.

{88} Apparently to bolster the theory that the wells belong to the Country Club, Catalina makes an argument not made below that earlier conveyances by the Crowders to an entity called Lee Trevino Enterprises, Ltd. include the wells. We are not required to consider arguments not made to the trial court in this procedural posture. *See Spectron Dev. Lab. v. Am. Hollow Boring Co.*, 1997–NMCA–025, ¶ 32, 123 N.M. 170, 936 P.2d 852. For the sake of completeness, and in an effort to finally end this litigation, we exercise our discretion to review the claim and find it has no merit. Catalina fails to acknowledge that Lee Trevino Enterprises, Ltd. is actually a predecessor entity to the Utility, not to the country club. Catalina made this clear in its motion to intervene and attached materials filed in September 1996. Those conveyances, thus, do not raise a question of fact requiring trial.

{89} Fourth, the Charles Crowder deed does not raise a question of fact either. There is no dispute that Charles and Phyllis Crowder held all their property as community property. Phyllis Crowder filed bankruptcy before the condemnation action was filed. The law is that when one spouse files for bankruptcy, the entire community passes into and becomes part of the bankrupt estate. *Swink v. Sunwest Bank (In re Fingado)*, 113 B.R. 37, 39 (Bankr.D.N.M.1990). Accordingly, Charles had nothing to convey when he executed the deed Catalina relies on. Further, Charles' deed purports to convey something Phyllis' deed does not. Even assuming Charles had something to convey, his deed would be void to the extent it at-

tempted to convey community real property without spousal joinder. NMSA 1978, § 40-3-13(A) (conveyance of community real property without joinder of spouse "shall be void and of no effect").

{90} Our decision is bolstered by the bankruptcy court's October 6, 2000, order lifting the automatic stay and allowing the state court to enter such form of condemnation judgment as it deemed fit, including Wells 8 and 19 as part of the property taken. Thus, the entity in control of all of the Crowders property subject to the 1996 settlement agreement allowed Wells 8 and 19 to be taken by the City—over Catalina's objection.

## DISQUALIFICATION OF DISTRICT JUDGE

{91} In May 2001 the City filed a petition with the PUC seeking approval for its proposed method of paying the judgment. Mesilla, Catalina and a wholly owned subsidiary and successor-in-interest of Catalina—Santa Teresa Country Club, Ltd. (the County Club)—sought to intervene in the PUC case. In response, the City filed a motion *in the district court* for injunctive and declaratory relief seeking to enjoin the Country Club, Catalina, and Mesilla from attempting to relitigate the value of the Utility before the PUC. The Country Club, as a separate entity, had not appeared in this case in any form before this motion was filed. The district court entered a temporary restraining order the same day the motion was filed.

{92} In response, the Country Club filed a peremptory challenge of the district judge. Rule 1-088.1 NMRA 2003. Catalina asserts the district court refused to honor the peremptory challenge because it was in his view untimely. Though the record does not reflect his precise rationale for refusing to honor the challenge, the district court did note in the order dissolving the temporary restraining order that the "Country Club is a member of the Certified Class of Customers. As a member of that Class, it is and has been a party to this case." Catalina sought a writ of superintending control from the New Mexico Supreme Court; but it was denied.

{93} Catalina's position is that the Country Club was an involuntarily joined, new party in the case and as such validly exercised its right to peremptorily challenge the district

judge. The City counters that the Country Club was not a party, and if it was, it was no more than an affiliated successor-in-interest or surrogate of Catalina and had no independent right to excuse the district judge. We resolve the issue in favor of the City though on different grounds.

{94} The right of peremptory excusal under Rule 1-088.1 is party specific. That is, each party has a separate right of excusal which cannot be affected by the actions of other parties in a case. Thus, in *JMB Retail Props., Co. v. Eastburn*, 114 N.M. 115, 118, 835 P.2d 831, 834 (1992) our Supreme Court clarified that only that party who requests a discretionary act of the judge will thereafter be precluded from later exercising a peremptory challenge. *Saavedra v. Thomson*, 114 N.M. 718, 719, 845 P.2d 812, 813 (1992) (holding that not opposing a motion is not an affirmative act requesting discretionary action).

{95} Here, the right of peremptory challenge belonged only to the Country Club. The Country Club did not appeal and is not a party before us and it has lost the right to challenge the trial court's action in refusing to honor the challenge. Catalina cannot make the Country Club's argument for it because the right does not belong to Catalina. *See Pashaian v. Eccelston Props., Ltd.*, 88 F.3d 77, 82–83 (2d Cir.1996) (holding that defendants did not have standing to vicariously raise an issue of judge's partiality against plaintiff). To allow Catalina to raise the issue in the Country Club's stead would in effect give Catalina the benefit of a right it failed to exercise and lost long ago.

## CONCLUSION

{96} Appellants lack standing to argue the substantive issues they raise because they are not "condemnees" within the meaning of the Code. We therefore dismiss their appeals and affirm the district court.

{97} **IT IS SO ORDERED.**

WE CONCUR: A. JOSEPH ALARID and CYNTHIA A. FRY, Judges.