2005-NMCA-036

109 P.3d 305

**EL DORADO UTILITIES, INC., a New Mexico corporation, Utilities, Inc., an Illinois corporation, Utilities, Inc. of New Mexico, a New Mexico corporation, Sarah Heon, as Personal Representative of the Estate of Larry Heon, Stacy L. Crossingham, Richard G. Kurman, Stephen Mee, and Pamela Mee, Plaintiffs–Appellants,**

v.

**The ELDORADO AREA WATER AND SANITATION DISTRICT, Defendant–Appellee.**

No. 24,276.

Court of Appeals of New Mexico.

March 22, 2005.

William E. Sundstrom, Robert C. Brannan, David F. Chester, Rose, Sundstrom & Bentley, LLP, Tallahassee, FL, John P. Salazar, Leslie McCarthy Apodaca, Alan Hall, Edward Ricco, Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, NM, for Appellants.

Frank R. Coppler, John L. Appel, Coppler & Mannick, P.C., Santa Fe, NM, for Appellee.

## OPINION

BUSTAMANTE, Chief Judge.

{1} This matter came on for hearing on Appellee's Motion for Expedited Remand or, in the Alternative, for Amendment of Opinion Sua Sponte. The motion as presented is denied. However, in light of the motion and Appellant's response to it, the Court has decided to revise the opinion. Therefore, the opinion filed February 18, 2005, is hereby withdrawn and the following substituted.

{2} This appeal involves an ongoing dispute over control of the water utility serving the Eldorado area of Santa Fe County. Plaintiffs challenge the lawfulness of the procedures and tactics used by the Eldorado Area Water and Sanitation District (the District) in its efforts to condemn El Dorado Utilities, Inc. (EDU). Plaintiffs argue that the bond issue undertaken by the District to finance the condemnation did not comply with legal requirements, that the District lacked authority to condemn because it acted abusively and in bad faith, and that the District interfered with EDU's attempt to sell the utility. The district court dismissed the complaint for failure to state a claim upon which relief could be granted, and Plaintiffs appeal. We reverse and remand on the issue of the bond resolution and affirm the dismissal of the other claims.

## BACKGROUND

{3} The District is a water and sanitation district created pursuant to the Water and Sanitation District Act, NMSA 1978, §§ 73-21-1 to -54 (1943, as amended through 2003). The District is a quasi-municipal governmental entity governed by a board of three directors elected by the residents of the District. *See* § 73-21-9(H), (I).

{4} Plaintiff EDU is a public water utility company regulated by the New Mexico Public Regulation Commission (the PRC). EDU owns and operates the water utility system at issue in this case. Plaintiff Utilities, Inc. (UI) is a privately owned water and wastewater company based in Illinois. Utilities, Inc. of New Mexico (UINM) is a wholly owned subsidiary of UI. The individual Plaintiffs are residents and taxpayers of the District. We refer to all plaintiffs collectively as "Plaintiffs," and EDU, UI, and UINM collectively as "utility Plaintiffs."

{5} In September 2001, EDU entered into a purchase agreement with UI/UINM for the sale of the utility. In December 2001, EDU filed a transfer application with the PRC pursuant to NMSA 1978, § 62-6-12 (1989) requesting approval of the sale of the utility to UI, and requesting approval for UINM to

own and operate the utility. The District intervened in the PRC proceeding, predicated upon its interest in protecting the "health, safety, prosperity, security and general welfare" of the residents by monitoring the "continuing availability of a safe, dependable water supply at an affordable cost." The District also asserted an interest in the policies regarding line extension to new customers given the limited availability of water resources in the area. The District's motion to intervene in the PRC proceeding was unopposed. The PRC held its proceedings in abeyance pending the outcome of this and other related litigation.

{6} In June and July 2002, the District adopted resolutions scheduling an election to determine whether the District's "voters supported its acquisition of EDU by purchase or condemnation to be financed through general obligation bonds and revenue bonds." The election held in August 2002 approved the issuance of general obligation bonds.

{7} After the election, the District adopted a resolution authorizing the issuance of approximately $7.9 million in general obligation bonds to finance the condemnation of the utility. The resolution authorized the District to levy property taxes as necessary to pay the bonds "notwithstanding any limitations on the rate or amount of such taxes."

{8} Within a month after the bond resolution was adopted, Plaintiffs filed suit requesting an injunction to prevent the issuance of the bonds on the grounds that allowing a levy of taxes without limitation contravenes the tax limitation section of the Community Service District Act, NMSA 1978, § 4–54–1 to –5 (1965, as amended through 1986), rendering the bond resolution invalid. Plaintiffs also requested a declaratory judgment that the District lacks authority to condemn EDU's utility because the District acted in bad faith and abused any condemnation power it possessed. EDU also requested damages caused by the District's interference with EDU's contractual relations with UI/UINM, and by its efforts to reduce the value of EDU's assets.

{9} Plaintiffs alleged that the District's intervention before the PRC was pretextual, caused delay in the transfer of the utility,

attempted to defeat the approval, and reduced the value of EDU's real and personal property for the District's sole benefit. Plaintiffs claimed that the District's purpose for intervention was to "defeat the sale on the basis that a condemnation proceeding against UI/UINM would be more costly than one against the current owner, EDU." In addition, Plaintiffs' Second Amended Complaint alleged the following:

18. [B]y intervening and testifying regarding the merits of the proposed condemnation, ... Defendant has stepped outside the bounds of its role as "public guardian" and is using the PRC proceedings as a mechanism for stopping or stalling approval of the purchase and reducing the value of EDU's property, and thereby the potential condemnation price. In fact, Defendant concedes that it is seeking denial of the transfer because it believes that the utility's price would be higher in a condemnation action against UI/UINM than against the current owner.

. . . .

90. Defendant's arguing the merits of the condemnation before the PRC solely for the purpose of thwarting the sale, restricting Utility Plaintiffs' rights to alienate and acquire, and reducing the market value of EDU's assets was, and is, an unlawful use of its governmental power.

91. Defendant's illegal use of the police power to further its proposed condemnation removes Defendant from the position of a neutral arbiter of the public good in that the actions described herein are designed to thwart the sale, restrict Utility Plaintiffs' protected rights to alienate and acquire private property, and lower the value of EDU's assets purely for Defendant's own benefit.

. . . .

101. Defendant's intentional and improper actions before the PRC described above have prevented Utility Plaintiffs from fulfilling their existing contractual relationship.

{10} Subsequent to the filing of this appeal, the District informed the district court it had completed the bond issue and sold the

bonds to a private purchaser. With funding in place, the District filed a petition to condemn EDU's utility. The condemnation proceeding is currently pending in the district court. Also, after the appeal was filed, EDU and UI/UINM terminated their purchase agreement.

## DISCUSSION

{11} On appeal, Plaintiffs argue that the complaint states a claim upon which relief can be granted based on: (1) the invalidity of the District's bond resolution, (2) the District's improper actions to devalue EDU's utility and interference with the sale of the utility, and (3) the District's lack of authority to condemn EDU's utility. We address each issue in turn, affirm the district court's granting of the motion to dismiss as to claims (2) and (3), and reverse and remand on the bond issue.

### Standard of Review

{12} This Court reviews a dismissal of a complaint under Rule 1–012(B)(6) NMRA de novo, as a question of law. *Valles v. Silverman*, 2004–NMCA–019, ¶ 6, 135 N.M. 91, 84 P.3d 1056. We test the sufficiency of a complaint, assuming that all well-pleaded facts therein are true. *Grover v. Stechel*, 2002–NMCA–049, ¶ 8, 132 N.M. 140, 45 P.3d 80. "A motion to dismiss for failure to state a claim should be granted only if it appears that plaintiff cannot recover, or be entitled to relief, under any state of facts provable under the complaint." *Noriega v. Stahmann Farms, Inc.*, 113 N.M. 441, 442, 827 P.2d 156, 157 (Ct.App.1992). The assertion that the district court erred in interpreting the statutes governing the District's general obligation bond issue presents a question of law which we also review de novo. *See Bajart v. Univ. of N.M.*, 1999–NMCA–064, ¶ 7, 127 N.M. 311, 980 P.2d 94.[1]

### 1. The Validity of the District's Bond Resolution

■ {13} Plaintiffs urge this Court to find that the complaint states a claim for relief as to the validity of the District's bond resolution. The bond resolution states in pertinent part:

> The ... Bonds shall constitute the general obligation indebtedness of the District, payable from ad valorem taxes which shall be levied at a rate which shall not exceed $10 per $1000 of net taxable value ... of property within the District ...; except that if the moneys produced from such levies, together with other revenues of the District, are insufficient to pay the annual principal of and interest on the ... Bonds, additional levies may be imposed as may be necessary for such purposes until the ... Bonds are fully paid.

According to Plaintiffs, the bond resolution does not limit the District's power to levy property taxes as required by Section 4–54–4, and it is therefore invalid. The Community Service District Act Section 4–54–4 provides: "The aggregate total of all taxes levied by a community service district for all purposes shall not exceed a rate of ten dollars ($10.00) ... on each one thousand dollars ($1,000) of net taxable value ... of taxable property within this community service district."

{14} Sections 73–21–17 to –19 of the Water and Sanitation District Act provide for the levy and collection of taxes by a district. Section 73–21–17 states in relevant part that water and sanitation districts "shall have power and authority to levy and collect ad valorem taxes on and against all taxable property within the district." Section 73–21–18 provides that a district should levy and collect taxes each year, determining the amount of money necessary to be raised by taxation, taking into account a variety of factors, including the funds needed to pay all principal and interest due on any bonds issued by the district. Section 73–21–19 provides:

---

1. We note that there are three types of Plaintiffs in this action, and that all of the Plaintiffs may not have standing as to each issue on appeal. *See City of Sunland Park v. Santa Teresa Servs. Co.*, 2003–NMCA–106, ¶ 39, 134 N.M. 243, 75 P.3d 843 (noting that a party's standing "depends on its factual and legal connection to the issue it wishes to litigate"). Because we are affirming the district court's dismissal of all claims except the bond issue, we need not explore the standing of each party in detail.

The board in certifying annual levies as herein provided, shall take into account the maturing indebtedness for the ensuing year as provided in its contracts, maturing bonds and interest on bonds, and deficiencies and defaults of prior years, and shall make ample provision for the payment thereof. In case the moneys produced from such levies, together with other revenues of the district, are not sufficient punctually to pay the annual installments on its contracts and bonds, and interest thereon, and to pay defaults and deficiencies, then the board shall make such additional levies of taxes as may be necessary for such purposes, and not withstanding any limitations, such taxes shall be made and continue to be levied until the indebtedness of the district shall be fully paid.

{15} Plaintiffs argue that there is a conflict between the tax limitation provision of the Community Service District Act, Section 4–54–4, and the Water and Sanitation District's Act provision on levies to cover defaults and deficiencies, Section 73–21–19. When statutes are in "conflict, they must be construed, if possible, to give effect to each. If the conflict is irreconcilable, the later-enacted statute governs." NMSA 1978, § 12–2A–10(A) (1997); *see also State v. Valdez*, 59 N.M. 112, 118, 279 P.2d 868, 872 (1955) (noting that later statute repeals an earlier statute to extent of repugnancy). A careful reading of Section 73–21–19 makes it clear that the legislature intended to incorporate the limiting provisions of Section 4–54–4 into the Water and Sanitation District Act.

{16} Sections 73–21–17 to –19 of the Water and Sanitation District Act were first enacted in 1943. Section 4–54–4 of the Community Service District Act was originally enacted in 1965. Section 73–21–27, incorporating Section 4–54–4 to bear on water and sanitation districts, was enacted in 1977. 1977 N.M. Laws, ch. 345, § 9. Section 73–21–27 provides: "With respect to the issuance of any negotiable securities representing an indebtedness of the water and sanitation district, the provisions and procedures set forth in the Community Service District Act [4–54–1 to 4–54–5 NMSA 1978] shall apply." This is an explicit and clear statement of legislative intent. The limiting provisions of Section 4–54–4 apply to the issuance of bonds by entities such as the District.

{17} We note that Section 73–21–27 was enacted by the same Chapter law in which the legislature amended Section 73–21–26, which describes the type of bond that water and sanitation districts may issue. The combination of the two provisions in the same law emphasizes the point that the legislature knew and understood it was limiting the power of such districts to impose taxes on property within their boundaries.

{18} A court should "construe all the provisions [of a statute] together and attempt to view them as a harmonious whole." *Cummings v. X–Ray Assocs. of N.M.*, 1996–NMSC–035, ¶ 45, 121 N.M. 821, 918 P.2d 1321; *see also Roberts v. Southwest Cmty. Health Servs.*, 114 N.M. 248, 251, 837 P.2d 442, 445 (1992) ("[W]e will give effect to each portion of the statute, if possible."). Sections 73–21–17 to –19 give the District the power to determine and impose annual tax levies as needed to meet its obligations, subject to the limitations of Section 4–54–4. The power to tax granted by the Water and Sanitation District Act is constrained by the Community Service District Act. To construe the statutes otherwise would nullify the limits contained in Section 4–54–4 as to water and sanitation districts. This result would be contrary to the express language of the statutes. Such a result would also be contrary to the legislative commandment that "[t]he Community Service District Act [4–54–1 to 4–54–5 NMSA 1978] shall be liberally construed to protect the interests and rights of the owners of the taxable property within the community service district." Section 4–54–5.

{19} We note that the definition of a "community service district" in the Community Service District Act is broad enough to encompass water and sanitation districts. Section 4–54–2(A) provides:

A. "community service district" means any single or multipurpose special district organized as a local public body of this state for the purpose of constructing and furnishing any urban-oriented service which another political subdivision of this state is authorized to perform, including

but not limited to the services of water for domestic, commercial or industrial uses, sewage, garbage, refuse collection and recreation, but not including the function [functions] or services of drainage, irrigation, reclamation, soil and water conservation or flood control[.]

The District is a "special district organized as a local public body ... for the purpose of ... furnishing [an] urban-oriented service," i.e., "water for domestic ... uses." Section 4-54-2(A). Thus, even without the explicit incorporating language of Section 73-21-27, it could be argued that the limitation of taxing power found in Section 4-54-4 would apply to the District. Given the wholesale incorporation of the Community Service District Act into the Water and Sanitation District Act, its application is undeniable.

{20} The District contends that the language in the bond resolution is not only permissible, but mandated. The District argues that Section 73-21-19, which states that "the board shall make such additional levies of taxes as may be necessary for such purposes, [ ] not withstanding any limitations ..." requires it to levy taxes sufficient to pay its debts, even if those taxes exceed the limitations of Section 4-54-4, whether or not the language is contained in the resolution. The District argues that the State and its political subdivisions, such as itself, must be able to pledge their full faith and credit to ensure repayment of general obligation bonds that have been issued. For example, if property values plummet, a higher tax rate would be necessary to meet the District's obligations. To do so may, hypothetically, require imposition of taxes beyond the ten mill limitation. The District also argues that there is no actual conflict between the Community Service District Act and the Water and Sanitation District Act in this case because no taxes have been levied yet; there is only the possibility of a conflict at some time in the future.

{21} We are not persuaded. To accept the District's arguments would require us to ignore everything the legislature did in enacting Section 73-21-27. This we cannot do. The language of the statutes is clear. The District can only levy taxes to pay indebtedness within the limits of Section 4-54-4. The District cannot issue bonds pursuant to a bond resolution that authorizes the levy of taxes beyond what Section 4-54-4 allows. The resolution provides that "additional levies may be imposed as may be necessary for such purposes until the ... Bonds are fully paid." This provision fails to limit the District's ability to levy taxes as required by Section 4-54-4 to ten dollars ($10.00) per thousand dollars ($1,000) of net taxable value of taxable property within the district, and is therefore invalid. Further, it is not necessary for the District to actually levy the taxes in excess of the ten mill limit for there to be an actual conflict.

{22} The language of the bond resolution itself is invalid, and that is sufficient for Plaintiffs to state a claim upon which relief can be granted. Plaintiffs originally requested injunctive relief on the issuance of the bonds. That request is now moot because the bonds have been issued and sold. On remand, the parties and the district court will no doubt be engaged in fashioning appropriate relief. The district court may fashion a remedy it deems appropriate consistent with our ruling.

## 2. The Alleged Improper Actions to Devalue EDU's Utility and Interfere with the Sale of the Utility

{23} The utility Plaintiffs argue that they stated a valid claim based on the District's improper actions to devalue EDU's assets and to interfere with the sale of the utility. The complaint alleges that the District intentionally intervened in the PRC proceedings concerning approval of the sale of the utility from EDU to UI/UINM for the improper purpose of delaying and defeating the sale in order to devalue the utility and thus reducing the compensation it would have to pay for the anticipated taking. Plaintiffs assert they have stated claims under the tort of intentional interference with contract and under the theory that the District abused its power in order to depress the value of the utility.

{24} New Mexico recognizes a cause of action for tortious interference with contractual relations. *Kelly v. St. Vincent Hosp.*, 102 N.M. 201, 207, 692 P.2d 1350, 1356

(Ct.App.1984); *M & M Rental Tools, Inc. v. Milchem, Inc.*, 94 N.M. 449, 452–55, 612 P.2d 241, 244–47 (Ct.App.1980). To establish a claim for intentional interference with contract, Plaintiffs must allege facts sufficient to show that the District improperly interfered with EDU and UI/UINM's contractual relations, "either through improper means or improper motive." *See Diversey Corp. v. Chem–Source Corp.*, 1998–NMCA–112, ¶ 20, 125 N.M. 748, 965 P.2d 332. Plaintiffs contend they have met this burden by alleging that the District intervened pretextually in the PRC proceedings for the improper purpose of reducing the cost of condemnation.

{25} Plaintiffs claim fails, however, because under the Tort Claims Act, NMSA 1978, §§ 41–4–1 to –27 (1976, as amended through 2004), a governmental entity may not be held liable for damages resulting from such a tort. Section 41–4–4(A) of the Torts Claim Act provides: "A governmental entity and any public employee while acting within the scope of duty are granted immunity from liability for any tort except as waived by the New Mexico Religious Freedom Restoration Act and by Sections 41–4–5 through 41–4–12 NMSA 1978." A governmental entity includes the state and all of its political subdivisions. NMSA 1978, § 41–4–3(B), (C) (2003). A water and sanitation district, once established, is "a governmental subdivision of the state" and "[e]very district shall be a body corporate with all the powers of a public or quasi-municipal corporation." § 73–21–9(I); *see also Yarger v. Timberon Water & Sanitation Dist.*, 2002–NMCA–055, ¶ 8, 132 N.M. 270, 46 P.3d 1270 ("Water and sanitation districts are special districts described by statutes and the courts as governmental subdivisions of the state with quasi-municipal powers. They are also quasi-governmental corporations."). The District and its board, as a quasi-municipal governmental body, falls within this definition of governmental entity, and is therefore granted immunity from tort actions such as this.

{26} In their reply brief, Plaintiffs argue that the Tort Claims Act does not bar their claim for damages because the District's conduct in devaluing the utility violates EDU's constitutional due process rights. Plaintiffs correctly note that the Tort Claims Act does not exclude a Section 1983 remedy for such violations. *Wittkowski v. State Corrections Dep't*, 103 N.M. 526, 531, 710 P.2d 93, 98 (Ct.App.1985), *overruled on other grounds by Silva v. State*, 106 N.M. 472, 477, 745 P.2d 380, 385 (1987). However, Plaintiffs did not raise a claim for damages under 42 U.S.C. § 1983 below, and may not raise it for the first time on appeal. *See Woolwine v. Furr's, Inc.*, 106 N.M. 492, 496–97, 745 P.2d 717, 721–22 (Ct.App.1987). We do not address the current viability of such a claim.

{27} We next turn to Plaintiffs' argument that they have stated a claim based on the District's improper actions to devalue the utility by intervening in the PRC proceeding. Plaintiffs cite to 4 Julius L. Sackman, *Nichols on Eminent Domain* § 12C.03 [1] (rev.3d ed.2001), for the proposition that any governmental action "which depresses value or inhibits increase in value" of the condemned property "is deemed an abuse of governmental power." Plaintiffs also rely on the following cases in support of their claim. *See Wash. Metro. Area Transit Auth. v. One Parcel of Land*, 413 F.Supp. 102, 106 (D.Md. 1976) (stating that government could not use its refusal to allow abandonment of unused road easement, on ground that subsequent condemnation of land for another purpose would be made more costly, as factor in determining property value in condemnation proceeding; "[s]uch action would be an abuse of governmental authority, resulting in a denial of due process"), *aff'd on other grounds*, 548 F.2d 1130 (4th Cir.1977); *see also United States v. Virginia Elec. & Power Co.*, 365 U.S. 624, 636, 81 S.Ct. 784, 5 L.Ed.2d 838 (1961) (stating that in determining damages for taking of landowner's property, diminution in value resulting from government's committing to prospective taking must be excluded; allowing public body to reduce property value by threatening condemnation and then take advantage of lower price when property is condemned would be "manifestly unjust" (internal quotation marks and citation omitted)); *Robertson v. City of Salem*, 191 F.Supp. 604, 611–612 (D.Or.1961) (stating that ordinance could not constitutionally be applied to land owner where evidence established that city adopted restrictive land use

ordinance in response to request of state government in order to depress land value prior to exercise of eminent domain by state); *United States v. 222.0 Acres of Land,* 324 F.Supp. 1170, 1180 (D.Md.1971) (stating that condemning authority could not directly or indirectly interfere with property owner's right to use land and then take advantage of resulting reduction in value to reduce price paid in condemnation where actions by state, induced by federal government prior to federal condemnation, restricted land usage and diminished property value); *Bd. of Comm'rs v. Tallahassee Bank & Trust Co.,* 108 So.2d 74, 85 (Fla.Dist.Ct.App.1958) (refusing to permit "an arbitrary exercise of the police power by one branch of government in order to pave the way for a less expensive exercise of the power of eminent domain by another branch" where state agency requested city to implement restrictive zoning in area of planned redevelopment by agency; stating that evidence of value of property prior to restriction was admissible to determine damages for condemnation).

■■■ {28} Plaintiffs' alternative approach is of no avail. To the extent Plaintiffs seek compensatory damages based on the District's alleged tortious conduct, the Tort Claims Act bars such a claim, as discussed above. The Tort Claims Act would not bar a claim for injunctive relief. NMSA 1978, § 41–4–17(A) (1982) ("Nothing in this section shall be construed to prohibit any proceedings for mandamus, prohibition, habeas corpus, certiorari, injunction or quo warranto."). However, Plaintiffs' claim again fails because an injunction generally will not lie if there is an adequate remedy at law. *See Amkco, Co. v. Welborn,* 2001–NMSC–012, ¶ 9, 130 N.M. 155, 21 P.3d 24 (noting that "injunctions are granted to prevent irreparable injury for which there is no adequate and complete remedy at law" (internal quotation marks and citation omitted)); *Insure New Mexico, LLC v. McGonigle,* 2000–NMCA–018, ¶ 7, 128 N.M. 611, 995 P.2d 1053 ("Injunctions are harsh and drastic remedies [that] should issue only in extreme cases of pressing necessity and only where there is no adequate ... remedy at law." (internal quotation marks and citation omitted)). The District

has filed a petition to condemn EDU's utility, and that case is proceeding independent of this appeal. The condemnation proceeding provides an adequate venue for resolving all issues as to the value of the condemned property.

### 3. The District's Authority to Condemn

■■■ {29} There is no dispute that the District has the authority to condemn the utility pursuant to Section 73–21–16(J). Plaintiffs argue, however, that the District should be prevented from exercising its authority to condemn EDU's utility as a consequence of its abusive, bad faith conduct in connection with the condemnation. Plaintiffs cite to *North v. Public Service Co.,* 101 N.M. 222, 229–30, 680 P.2d 603, 610–611 (Ct.App. 1983), for the proposition that even if an entity possesses the power of eminent domain, it may exceed its authority to condemn by acting abusively or in bad faith, and may be liable for damages in tort if it carries out the condemnation in such a manner.

{30} As discussed previously, the District is a quasi-municipality immune from suit under the Tort Claims Act. To the extent Plaintiffs rely on *North* for the proposition that the District is liable in tort for any possible bad faith or abusive conduct, such action is barred by the Tort Claims Act. Furthermore, the Court in *North* stated that a public utility with the right to condemn "cannot be held liable for bad faith in exercising a lawful right granted by the legislature." 101 N.M. at 228, 680 P.2d at 609. The District's intervention in the PRC proceedings was a lawful act. There is nothing unlawful about the District taking a position in the PRC proceedings against the sale of EDU to UI/UINM. The District was no more than a litigant in the PRC proceeding, and as the district court reasoned,

> It is true that the exercise of governmental power which depresses the value for condemnation purposes can constitute an abuse; but, in this case, the District did not have any decision making authority over the claimed actions that resulted in

damages. The authority of those decisions rests exclusively with the PRC. So, to the extent that the District takes the position which either is or is not adopted by the PRC, the District does not exercise the kind of power that would lead to some basis for a damage claim or injunctive relief.

{31} Additionally, as discussed in the previous section, any claim EDU has regarding valuation or condemnation should be brought in the condemnation proceeding, which provides an adequate remedy at law.

**CONCLUSION**

{32} We reverse and remand on the issue of the bond resolution and affirm the remainder of the district court's order.

{33} **IT IS SO ORDERED.**

WE CONCUR: JONATHAN B. SUTIN, and RODERICK T. KENNEDY, Judges.