2008-NMCA-143

194 P.3d 755

**MOONGATE WATER COMPANY, INC., Plaintiff–Appellant,**

v.

**DOÑA ANA MUTUAL DOMESTIC WATER CONSUMERS ASSOCIATION, Defendant–Appellee.**

No. 27,284.

Court of Appeals of New Mexico.

Sept. 4, 2008.

Freedman Boyd Daniels, Hollander Goldberg & Ives, P.A., Joseph Goldberg, Matthew L. Garcia, Albuquerque, NM, Kyle W. Gesswein, Las Cruces, NM, for Appellant.

Jones, Snead, Wertheim & Wentworth, P.A., Jerry Todd Wertheim, Carol A. Clifford, Santa Fe, NM, for Appellee.

**OPINION**

CASTILLO, Judge.

{1} In this case, we consider whether an association that is organized under the Sanitary Projects Act (SPA), NMSA 1978, §§ 3–29–1 to –21 (1965, as amended through 2006), is immune from suit for damages, pursuant to the New Mexico Antitrust Act (NMAA), NMSA 1978, §§ 57–1–1 to –17 (1891, as amended through 1987). We conclude that an SPA association is a special function governmental unit, established by state law, and immune from damages for liability under the NMAA. Accordingly, we affirm the district court.

## I. BACKGROUND

{2} Moongate Water Company (Moongate) is a public water utility company and provides residential water services to communities in and near Las Cruces, New Mexico (the City). Doña Ana Mutual Domestic Water Consumers Association (Doña Ana) is an association formed under the SPA, also for the purpose of providing water services in the Las Cruces area. Doña Ana, Moongate, and the City have been contesting the right to provide water within an area east of Interstate 25 and north of Las Cruces for a number of years, and the dispute has resulted in numerous lawsuits. *See Doña Ana Mut. Domestic Water Consumers Ass'n v.City of Las Cruces,* 516 F.3d 900 (10th Cir.2008); *Moongate Water Co., Inc. v. Doña Ana Mut. Domestic Water Consumers Ass'n,* 420 F.3d 1082 (10th Cir.2005); *Doña Ana Mut. Domestic Water Consumers Ass'n v. N.M. Pub. Reg. Comm'n,* 2006–NMSC–032, 140 N.M. 6, 139 P.3d 166.

{3} In the case before us, Moongate sued Doña Ana and the City for damages alleging antitrust violations contrary to the NMAA. Specifically, Moongate claimed that Doña Ana conspired with the City "to monopolize or attempt to monopolize the market for the provision of water utility services." Doña Ana filed a motion to dismiss the complaint under Rule 1–012(B)(6) NMRA and argued that Doña Ana was immune from suit for damages under the NMAA. The district court agreed and granted the motion to dismiss. Moongate appeals the district court's ruling.

## II. DISCUSSION

{4} The parties agree that this Court reviews de novo the district court's determinations of the law and interpretation of applicable statutes. *See Sonic Indus. v. State,* 2006–NMSC–038, ¶ 7, 140 N.M. 212, 141 P.3d 1266 (stating that "interpretation of phrases within a statute is a question of law that is reviewed de novo"); *Padwa v. Hadley,* 1999–NMCA–067, ¶ 8, 127 N.M. 416, 981 P.2d 1234 (explaining that a district court's decision to grant a Rule 1–012(B)(6) motion is a question of law, which is reviewed de novo). We thus turn to the statutes at issue.

{5} The NMAA makes it unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize trade or commerce within New Mexico. Section 57–1–2. The remedies under the NMAA are divided into two categories: injunctive relief and damages. The statute allows any person to recover injunctive relief, costs, and reasonable attorney fees for violations of the NMAA. Section 57–1–3(A). "Person" is defined by the NMAA as any "individual, corporation, business trust, partnership, association or ... governmental or other legal entity." Sections 57–1–1.2, –17(B)(2) (internal quotation marks omitted). Recovery of damages, however, is not allowed against local governments, government officials, or government employees acting in an official capacity. Section 57–1–17(A)(1). In the case at hand, both parties characterize the prohibition on recovery of damages against a local government in terms of immunity.

{6} The district court looked to the statutory definitions of local governments and SPA associations. Section 57–1–17(B)(1) defines "local government" as

(a) a city, county or any other general function governmental unit established by state law; or

(b) a school district, sanitary district or any other special function governmental unit established by state law[.]

The SPA authorizes the establishment of associations, which are described as "political subdivision[s] of the state" and which are "empowered by the state to receive public funds for acquisition, construction and improvement of water supply, reuse, storm drainage and wastewater facilities in communities, and to operate and maintain such facilities for the public good." Section 3–29–3. The district court ruled that Doña Ana was immune because " '[l]ocal government' includes 'any other special function governmental unit established by state law[,]' which clearly includes political subdivisions created under the SPA." Doña Ana urges this Court to affirm based either on the contention that an SPA association is a "sanitary district" within the meaning of Section 57–1–17(B)(1)(b) or on the district court's ruling

that the legislature intended to include SPA associations as special function governmental units for purposes of Section 57–1–17(A).

{7} Moongate marshals several arguments to support its contention that Doña Ana is not immune from paying damages under the NMAA: (1) an SPA association is not a sanitary district; (2) an SPA association is not created by state law; (3) an SPA association does not operate like a governmental unit; and (4) under the federal Local Government Antitrust Act of 1984 (LGAA), 15 U.S.C. §§ 34–36 (1984), the purposes of governmental immunity are not served by extending immunity to cover an SPA association. We address each of these arguments in turn. Moongate also argues that in district court, Doña Ana erroneously relied on an analogy to the immunity provisions of the Tort Claims Act, NMSA 1978, §§ 41–4–1 to –29 (1976, as amended through 2007). We do not reach Moongate's argument regarding application of the Tort Claims Act because we conclude that SPA associations are immune under the NMAA.

**A. Sanitary Districts**

{8} The NMAA extends immunity to "sanitary districts." Section 57–1–17(B)(1)(b). The Water and Sanitation District Act (WSD Act), NMSA 1978, §§ 73–21–1 to –55 (1943, as amended through 2005), allows for the creation of "districts," Section 73–21–3, which are defined in the following way:

> "[D]istrict" means a water and sanitation district that is established pursuant to that act and that is either entirely within or partly within and partly without one or more counties, provided those parts or parcels of the district lying in two or more counties are contiguous with one another, and further provided, a district created pursuant to a petition signed by the board of county commissioners of a county shall be entirely within that county[.]

Section 73–21–4(B). Doña Ana asserts that the term "sanitary district" in Section 57–1–17(B)(1)(b) is ambiguous and should be construed to embrace both water and sanitation districts as defined by the WSD Act, as well as associations formed under the SPA. Moongate, on the other hand, argues that

water and sanitation districts are formed under an entirely different statutory scheme than are associations formed under the SPA. Further, according to Moongate, water and sanitation districts have significant powers and responsibilities not given to associations formed under the SPA. Based on these distinctions, Moongate contends that the legislature intended for water and sanitation districts to be immune from damages liability under the NMAA but did not intend for SPA associations to be similarly immune.

{9} We consider it unnecessary to decide whether a "sanitation district," Section 73–21–4(B), created by the WSD Act was the only entity contemplated by the legislature when it shielded "sanitary districts," Section 57–1–17(B)(1)(b), from payment of damages under the NMAA. Section 57–1–17(A)(1). The legislature provided an alternate category of entities that would be immune from suit for damages—special function governmental units. We conclude that a detailed analysis of the governmental characteristics of an SPA association is better applied to this immunity provision than the "sanitary district" provision. For this reason, we do not decide whether an SPA association is a "sanitary district" for the purposes of the NMAA. We thus turn to Moongate's arguments in opposition to the district court's ruling that an SPA association is a special function governmental unit.

**B. Established by State Law**

{10} The NMAA includes in its definition of "local governments," "a school district, sanitary district, or any other special function governmental unit established by state law." Section 57–1–17(B)(1)(b). Based on this definition, Moongate contends that Doña Ana does not come within the definition of "local government" because it is not established by state law. In order to support this argument, Moongate points to several local governmental units and cites the statutory provisions that create those governmental units in order to demonstrate how those units are clearly established under state law. *See* NMSA 1978, §§ 3–2–1 to –9 (1965, as amended through 1999) (detailing the incorporation of a municipality and requiring the

filing of a petition, approval of the county commission, and the election by residents); § 73–21–9 (requiring the filing of a petition, approval of the district court and a vote by taxpayers in order to create water and sanitation districts); NMSA 1978, § 22–4–2 (1993) (controlling the creation of a school district and requiring approval by the state board). Moongate then points out that an SPA association's board need only file a certificate of incorporation in order to establish an SPA association. See § 3–29–15. Moongate thus analogizes the formation of an SPA association to the general statutory procedures for the incorporation of a business, see NMSA 1978, §§ 53–12–1 to –5 (1967, as amended through 2003), and argues that because SPA associations are created in the same manner as a corporation, an SPA association cannot be established by state law. This argument is without merit.

{11} Moongate suggests that we compare the formation of school districts and water and sanitation districts to the formation of an SPA association, and we take this opportunity to do so. Under the WSD Act, a water and sanitation district is formed when a petition is filed with the district court, and the petition is required to set forth certain details regarding the proposed district. Section 73–21–6(A), (B). The district court then holds a hearing to determine whether the petition is in conformity with the WSD Act. Section 73–21–9. In order to create a school district, the board of education must receive a recommendation from the state superintendent or a resolution from either the voters in a district or the local board of the existing school district. Section 22–4–2(A). These recommendations or resolutions must conform to criteria that are found in Section 22–4–2(B). Thus, both water and sanitation districts and school districts are created when a state entity receives a request and that request satisfies the specific statutory prerequisites for that particular entity.

{12} The formalities involved with formation of an SPA association are similar to forming any public corporation: "[t]he certificate of association and bylaws shall be acknowledged as required for deeds of real estate and shall be filed in the office of the public regulation commission." Section 3–29–17. By enacting the SPA, however, the legislature has provided a governmental solution for a particular problem: water supply in the rural communities in New Mexico. Section 3–29–3. The purpose, membership, and activities of an SPA association are carefully circumscribed by state law. For example, "the department [of the environment] may prescribe by rule guidelines for bylaws and rules of an association." Section 3–29–19.1; see § 3–29–2(C) (defining "department" as "department of the environment"). Additionally, "[a]ll persons within a community who participate or desire to participate in any project may become members of an association upon complying with the rules and regulations prescribed by the board of directors of the association, such rules and regulations to meet with the approval of the department [of the environment]." Section 3–29–11. The SPA also controls the project planning process and the procedure for contracting a project. See § 3–29–4. The statute requires an association to maintain open membership upon the payment of reasonable fees. See § 3–29–11. The SPA also explains that the department of the environment will oversee the operation of SPA associations. See § 3–29–7. Finally, we observe that the SPA explains that SPA associations are "empowered by the state to receive public funds for acquisition, construction and improvement of water supply, reuse, storm drainage and wastewater facilities in communities, and to operate and maintain such facilities for the public good." Section 3–29–3. Accordingly, we conclude that SPA associations are established under state law.

## C. Special Function Governmental Unit

{13} Moongate asserts a number of reasons to support its position that an SPA association cannot be a special function governmental unit: (1) SPA associations are not like the other entities that are specifically provided with immunity under the NMAA, (2) SPA associations do not operate as political subdivisions, and (3) SPA associations are more like businesses than governmental units. We will address each of Moongate's contentions separately.

## 1. Comparing Water and Sanitation Districts with SPA Associations

{14} Initially, we address Moongate's contention that SPA associations are unlike the other entities that are immune from suit for damages under the NMAA. Although Moongate distinguishes many of the entities listed in the NMAA, we resolve the issue by comparing SPA associations with water and sanitation districts.

{15} As we indicated in preceding paragraphs, "[t]he purpose of the SPA is to improve the public health of the people of New Mexico by establishing sanitary domestic water facilities to supply water to rural unincorporated communities, which otherwise would likely have no means to procure usable water." *El Vadito de los Cerrillos Water Ass'n v. N.M. Pub. Serv. Comm'n*, 115 N.M. 784, 791, 858 P.2d 1263, 1270 (1993). Similarly, water and sanitation districts are created for the purpose of "purchasing, acquiring, establishing or constructing waterworks to supply water," and "purchasing acquiring, establishing or constructing sanitary sewers" for sewage disposal. Section 73–21–3(A), (B). In addition to having similar purposes, both entities, depending on the manner of their formation, are subdivisions of the state or county in which they are formed. *See* § 3–29–3 (establishing an SPA association as "a political subdivision of the state"); Section 73–21–9(I) (establishing a water and sanitation district as "a governmental subdivision of the state" if a majority of voters are in favor of the organization). Furthermore, both entities serve the public interest. *See* § 3–29–3 (stating that SPA associations "improve the public health of rural communities in New Mexico"); Section 73–21–1 (stating that water and sanitation districts "serve a public use" and "promote the health, safety, prosperity, security and general welfare of the inhabitants" of the district). Water and sanitation districts and SPA associations share other similarities: (1) both may sue or be sued, *compare* § 3–29–15, *with* § 73–21–16(C); (2) both are administered by boards of directors chosen from members of the association or district, *compare* § 3–29–12, *with* § 73–21–15.1; (3) both operate under bylaws, *compare* §§ 3–29–16, –17 (providing that SPA associations are to operate under a filed certificate of association and bylaws), *with* § 73–21–16 (providing that water and sanitation districts operate under bylaws and corporate seal); (4) both may impose assessments or taxes, *compare* § 3–29–15 (providing that SPA associations may impose fees and assessments), *with* § 73–21–18 (providing that water and sanitation districts may levy and collect taxes); and (5) both have the power of eminent domain, *compare* § 3–29–6(A), *with* § 73–21–16(J).

{16} The legislature also made both entities eligible for loans and grants under the Water Project Finance Act, NMSA 1978, §§ 72–4A–1 to –10 (2001, as amended through 2007). The Water Project Finance Act includes SPA associations, as well as water and sanitation districts, under its definition of a "political subdivision." Section 72–4A–3(C) (" '[P]olitical subdivision' means a municipality, county, irrigation district, conservancy district, special district, acequia, soil and water conservation district, water and sanitation district or an association organized and existing pursuant to the [SPA.]"). Political subdivisions qualify, under certain conditions, for water project funds from the state. Section 72–4A–7(A). Also, the regulations of the Department of Finance Administration that implement the Water Project Finance Act include SPA associations and water and sanitation districts under the definition of a "political subdivision," and thus both entities qualify for water project funds from the state. *See* 2.110.2.7(M) NMAC (2007) (including SPA associations and water and sanitation districts among "[p]olitical subdivisions of the state" for purposes of receiving community development block grants).

{17} Moongate points out that, while water and sanitation districts have the power "to levy and collect ad valorem taxes on and against all taxable property within the district," § 73–21–17, SPA associations are given no such taxing authority. SPA associations are, however, empowered by the state to impose assessments on association members, apart from service and membership fees, in order to finance the extension of water or sewer service. Section 3–29–6(B)(7). Doña Ana asserts, and we agree,

that "[s]pecial assessments are a species of taxation." *In re Proposed Middle Rio Grande Conservancy Dist.*, 31 N.M. 188, 209, 242 P. 683, 692 (1925) (internal quotation marks and citation omitted).

{18} Moongate also contends that the statutory schemes that establish the two types of entities are so different that water and sanitation districts and SPA associations cannot be usefully compared. The WSD Act provides for the organization of districts subject to the procedures set forth in the Special District Procedures Act, NMSA 1978, §§ 4–53–1 to –11 (1965). Section 73–21–5. The SPA specifically exempts SPA associations from following the procedures established by the Special District Procedures Act (SDPA). Section 3–29–21. We do not find the exemption of SPA associations from the procedures set forth in the SDPA to be determinative of the status of SPA associations. The SDPA establishes a county special district commission to oversee the creation and maintenance of special districts. *See* §§ 4–53–3 to –11. The SPA has its own procedures for establishing associations, and the associations remain under the supervision of the department of the environment. *See* § 3–29–7.

{19} Moongate further argues that the New Mexico Environment Department has distinguished between water and sanitation districts and certain SPA associations in a publication. *See* N.M. Envtl. Fin. Ctr., *How to Form a Water & Sanitation Dist. in N.M.* (2006), *available at* http://www.nmenv.state. nm.us/cpb/FinalReport-July2006.pdf. This publication does explain the differences between the entities for the purpose of helping a community to form a water and sanitation district. *Id.* § 1, at 3. We observe, however, that it was prepared by the New Mexico Environmental Finance Center, and there is no indication from the document that it expresses the views of the New Mexico Environment Department. Irrespective of the information in the publication, we agree that there are differences between the entities. Indeed, there would be little point in separate statutory schemes that establish different types of water providers if the different organizations operated in precisely the same manner. Nevertheless, those differences do

not provide a basis for us to hold that water and sanitation districts should be immune from liability for antitrust damages while SPA associations should be subject to such damages.

■ {20} Along these lines of comparison between SPA associations and other governmental units, Moongate contends that this Court should adopt the analysis used by some federal courts in order to establish whether Doña Ana exhibits the general characteristics that are traditionally associated with a governmental unit. These characteristics are divided into five categories: the creation of the entity, the purpose of the entity, the operation of the entity, the rights and liabilities of the entity, and the dissolution of the entity. *In re Matter of Kent*, 190 B.R. 196, 204 (Bankr.D.N.J.1995). We have already examined several of these factors and have determined (1) that SPA associations are established by state law in order to fulfill a specific governmental purpose; (2) that SPA associations and water and sanitation districts have similar purposes; (3) that the department of the environment oversees the operation of an SPA association; (4) that an SPA association, like a water and sanitation district, may sue or be sued; (5) that an SPA association may impose assessments apart from service fees and dues; (6) that SPA associations and water and sanitation districts are eligible to receive public financing; and (7) that both entities have the power of eminent domain. Although we think that it is proper to use the five categories in determining whether an entity is a governmental unit, as do the federal cases, we are not bound by the analyses or conclusions reached in the federal cases. *See Sundial Press v. City of Albuquerque*, 114 N.M. 236, 239, 836 P.2d 1257, 1260 (Ct.App.1992) (explaining that "[t]he reasoning of federal decisions on this matter, if not in conflict with controlling New Mexico authority, can be persuasive" but cautioning that "we are not bound by these federal decisions"). Based on the comparison between water and sanitation districts and SPA associations, we are persuaded that SPA associations share many characteristics with entities that are immune from liability for damages under the NMAA.

## 2. Political Subdivision

{21} The SPA identifies SPA associations as "political subdivision[s] of the state" and "public bod[ies] corporate." Sections 3–29–3, –15. Moongate nevertheless contends that Doña Ana is not a local government for the purposes of the NMAA and argues (1) that the immunity provisions of the NMAA do not apply because the NMAA refers to local governments and not to political subdivisions and (2) that SPA associations possess "none of the characteristics traditionally associated with political subdivisions." We first point out that the other entities that are named in the NMAA's immunity provision, including school districts, water and sanitation districts, cities, and counties, *see* § 57–1–17(B)(1), have been previously identified as political subdivisions. *See Hurley v. Vill. of Ruidoso,* 2006–NMCA–041, ¶ 8, 139 N.M. 306, 131 P.3d 693 (referring to school districts and counties as political subdivisions); *El Dorado Utils., Inc. v. Eldorado Area Water & Sanitation Dist.,* 2005–NMCA–036, ¶ 25, 137 N.M. 217, 109 P.3d 305 (explaining that for the purposes of the Tort Claims Act, a water and sanitation district is a governmental entity, which "includes the state and all of its political subdivisions"); *City of Carlsbad v. Grace,* 1998–NMCA–144, ¶ 32, 126 N.M. 95, 966 P.2d 1178 (noting that a city is a political subdivision). As a result, we reject the argument that the legislature's use of the terms "political subdivision" in the SPA and "local government" in the NMAA leads to a conclusion that the legislature did not intend for SPA associations to be immune from damages under the NMAA.

{22} In *Wilson v. Denver,* our Supreme Court refused to extend governmental status to a ditch association, which was identified by statute as both a "political subdivision" and a "corporation." 1998–NMSC–016, ¶ 42, 125 N.M. 308, 961 P.2d 153. The Court in that case concluded that the ditch association was "a hybrid between a corporation and a public body." *Id.* The *Wilson* Court provided two bases for this conclusion: (1) the statute in question directed that "ditches or acequias shall for the purposes of th[at] article be considered as corporations," *id.*; and (2) "the [l]egislature chose to treat ditch associations

as corporations for the specific purpose of electing officers, . . . by approving proportionate voting but granting to ditch association members the discretion to select the most appropriate system of voting for each individual ditch." *Id.*

{23} In the present case, the legislature has not indicated that an SPA association should have similar hybrid status. First, Section 3–29–15 does not state that SPA associations shall "be considered as corporations." *Id.* Instead, Section 3–29–15 states that members of an SPA association "constitute a public body corporate." The legislature has, in numerous statutes, demonstrated that "public bodies politic and corporate" are instrumentalities of the government. *See* NMSA 1978, § 6–21–4(A) (2006) ("There is created a public body politic and corporate, separate and apart from the state, constituting a governmental instrumentality to be known as the 'New Mexico finance authority' for the performance of essential public functions."); NMSA 1978, § 58–18–4(A) (2003) ("There is created a public body politic and corporate, separate and apart from the state, constituting a governmental instrumentality, to be known as the 'New Mexico mortgage finance authority', for the performance of essential public functions."); NMSA 1978, § 62–16A–3(A) (2007) ("The 'New Mexico renewable energy transmission authority' is created as a public body, politic and corporate, separate and apart from the state, constituting a governmental instrumentality for the performance of essential public functions."); NMSA 1978, § 70–6–2(G) (1993) (defining "public body" as "the state or any department, board, commission, bureau, institution, public agency, county or political subdivision thereof, including bodies corporate, bodies politic, municipal corporations, school districts, conservancy districts and quasi-municipal corporations of all kinds"); NMSA 1978, § 72–16–22 (1986) ("The authority may exercise the . . . duties, privileges, immunities, rights, liabilities and disabilities appertaining to a public body politic and corporate and constituting a quasi-municipal corporation and political subdivision of the state established as an instrumentality exercising public and essential governmental and proprietary functions to provide for the pub-

lic health, safety and general welfare[.]"); NMSA 1978, § 73–1–11 (1931) ("Upon declaring the district organized, the same shall be a political subdivision of the state of New Mexico, and a body corporate with all the powers of a public or municipal corporation[.]"). Unlike the statute in *Wilson,* the SPA consistently states that SPA associations are "political subdivision[s] of the state," *see* § 3–29–3, and that SPA associations are instrumentalities of the government as "public bod[ies] corporate." Section 3–29–15.

{24} Second, unlike in *Wilson,* we can identify no specific legislative purpose for classifying an SPA association as a corporation. To the contrary, the legislature has made public funds available in order to achieve a specific, governmental purpose for SPA associations: "to improve the public health of rural communities." Section 3–29–3. We therefore conclude that the legislature, by including the language "political subdivision" and "public body corporate," intended for SPA associations to be special function governmental units.

{25} Moongate's second argument invites us to disregard the plain language of the statute by asking us to analyze whether Doña Ana actually operates as a political subdivision. We decline the invitation. *See* § 3–29–3 (describing the purpose of the SPA as "providing for the establishment and maintenance of a political subdivision of the state"); *McAlpine v. Zangara Dodge, Inc.,* 2008–NMCA–064, ¶ 12, 144 N.M. 90, 183 P.3d 975 (refusing to accept a party's argument because that argument would require this Court to ignore the language of the statute at issue). Further, we have already conducted a detailed comparison between water and sanitation districts, which are political subdivisions, and SPA associations, and we concluded that there are more similarities than differences.

## 3. Businesses Versus Governmental Units

{26} The SPA contains the following language:

Upon the filing of each certificate and copy thereof as provided in Section 3–29–17 ..., the persons so associating, their successors and those who may thereafter become members of the association constitute a public body corporate by the name set forth in the certificate and by such name may sue and be sued, have capacity to make contracts, acquire, hold, enjoy, dispose of and convey property real and personal, accept grants and donations, borrow money, incur indebtedness, impose fees and assessments and do any other act or thing necessary or proper for carrying out the purposes of their organization.

Section 3–29–15. Moongate argues that this section of the SPA indicates that the legislature intended for SPA associations to be businesses, rather than governmental units. We have already discussed the language "public body corporate" in paragraphs 23–24, and we concluded that those words establish legislative intent that SPA associations are units of government. In this section, we will focus on the "sue or be sued" provision and the "distinctly private language" of Doña Ana's articles of incorporation.

{27} Because the SPA allows SPA associations to "sue and be sued," *id.,* and the SPA does not limit the types of claims which may be brought, Moongate contends that Doña Ana is "subject to the full range of liabilities." We disagree. Moongate's argument seems to be that the SPA itself is the only statute that the legislature can use to limit the liability of SPA associations. If that were correct, immunity provisions in other statutes, such as the NMAA, would have no force at any time. We therefore conclude that the SPA's failure to limit the claims that can be brought against SPA associations does not necessarily mean that any conceivable claim is allowable. We also observe that municipalities, school boards, and water and sanitation districts, which are expressly immune from payment of damages under the NMAA, also have the capacity to "sue and be sued." NMSA 1978, § 3–18–1(A) (1972); NMSA 1978, § 22–5–4(E) (2005); § 73–21–16(C). As a result, the power to "sue and be sued" cannot be read to prohibit the legislature from placing limits on a plaintiff's ability to obtain damages against a defendant with governmental characteristics. *See Marrujo v. N.M. State Highway Transp. Dep't,* 118 N.M. 753, 761, 887 P.2d 747, 755 (1994) ("The

right to sue the government is a statutory right and the legislature can reasonably restrict that right."); *Sanchez v. Santa Ana Golf Club, Inc.*, 2005–NMCA–003, ¶ 12, 136 N.M. 682, 104 P.3d 548 ("[A] sue or be sued clause will only accomplish a waiver [of sovereign immunity] when the clause clearly expresses an intent to waive immunity.").

{28} Moongate also argues that Doña Ana's articles of incorporation show that Doña Ana is a private corporation and not a governmental entity. Specifically, Moongate contends that Doña Ana's articles evince a private purpose, corporate powers, a lack of government oversight, and private borrowing powers. We have already shown that SPA associations operate for a public purpose under the governing statute. *See* § 3–29–3. We have further explained that an SPA association is a public body corporate, Section 3–29–15, which operates separately from the state but yet as an instrumentality of the government. We have detailed the similarities between the powers that water and sanitation districts may wield and identical powers that are granted to SPA associations. We have also pointed out that SPA associations operate under the supervision of the department of the environment. Section 3–29–7. Moongate argues that an SPA association's ability to borrow funds from any source is indicative of private powers. We have found no authority, however, to suggest that water and sanitation districts are restricted from borrowing money from particular sources, *see* § 73–21–16(E), and Moongate provides us with none. In fact, Moongate provides us with no authority at all to support the proposition that entities with some corporate characteristics are not to be considered governmental units for the purposes of immunity from damages awards. Ultimately, although an SPA association may have some corporate powers, the association may only use "those powers conferred upon [it] by [its] enabling legislation, and those necessarily implied to implement those powers." *Yarger v. Timberon Water & Sanitation Dist.*, 2002–NMCA–055, ¶ 8, 132 N.M. 270, 46 P.3d 1270. Considering all of the factors, we conclude that the arguably corporate characteristics of an SPA association do not require a conclusion that the associations are business and not governmental units.

## D. Purposes of Governmental Immunity and the LGAA

{29} Last, we address Moongate's contention that to afford SPA associations immunity under the NMAA would not serve the purposes of local governmental immunity from antitrust suits for damages. The NMAA immunity provision has not previously been construed by our courts. Moongate recommends that we adopt the purposes advanced by Congress when it promulgated the LGAA, similar to those in published House Reports. The LGAA uses similar terms as Section 57–1–17 to define a "local government" and extends antitrust immunity to the following entities:

(A) a city, county, parish, town, township, village, or any other general function governmental unit established by State law, or

(B) a school district, sanitary district, or any other special function governmental unit established by State law in one or more States[.]

15 U.S.C. § 34(1)(A), (B). Moongate points to a House Committee Report and summarizes the federal purpose for providing immunity under the LGAA as follows: (1) to protect a municipality's ability to govern itself and (2) to protect against governmental liability for potentially large antitrust damage awards. H.R.Rep. No. 98–965, at 2 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4602, 4603. Doña Ana contends that although federal law is instructive, it is not binding or conclusive. We agree with Doña Ana. *See Lowery v. Atterbury*, 113 N.M. 71, 74 n. 2, 823 P.2d 313, 316 n. 2 (1992) ("We cite federal cases only to the extent that we find them instructive and not as binding precedent."). We hesitate to adopt and apply the substance of a federal committee report when our courts have emphasized that the state legislature "speaks solely through its concerted action as shown by its vote." *United States Brewers Ass'n v. Dir. of the N.M. Dep't of Alcoholic Beverage Control*, 100 N.M. 216, 218, 668 P.2d 1093, 1095 (1983) (internal quotation marks and citation omitted); *Claridge v. N.M. State*

*Racing Comm'n,* 107 N.M. 632, 639, 763 P.2d 66, 73 (Ct.App.1988) (internal quotation marks and citation omitted). Rather than delve into the purposes that motivated Congress to pass the LGAA, we turn to case law, which construes language that is identical in the LGAA and the SPA, in order to determine how other courts have considered the term "special function governmental unit" in the context of antitrust litigation.

{30} The Tenth Circuit Court of Appeals has explained that the LGAA "was enacted to give greater immunity to local governments" and that "[i]t was a legislative response to an increasing number of antitrust suits, and threatened suits, that could undermine a local government's ability to govern in the public interest." *Tarabishi v. McAlester Reg'l Hosp.,* 951 F.2d 1558, 1564 (10th Cir. 1991) (internal quotation marks and citation omitted). In *Tarabishi,* the Tenth Circuit analyzed whether an entity was a special function governmental unit based on two factors: (1) "where liability for an antitrust damage award [would] actually fall," and (2) how the state legislature viewed the "character of [the] local entity." *Id.* at 1566. The second consideration tracks our own analysis in previous paragraphs, and we have already concluded that our legislature intended for SPA associations to be governmental units.

{31} Regarding the first factor, Moongate argues that there is no evidence that an antitrust damage award would fall on the City and that Doña Ana is therefore not a special function governmental unit. Doña Ana contends that whether the City will be liable is irrelevant and urges that the inquiry is whether the award would impair government functions. We agree with Doña Ana. We begin by considering again the purpose of the SPA, which is

> to improve the public health of rural communities in New Mexico by providing for the establishment and maintenance of a political subdivision of the state that is empowered by the state to receive public funds for acquisition, construction and improvement of water supply, reuse, storm drainage and wastewater facilities in communities, and to operate and maintain such facilities for the public good.

Section 3-29-3. If an entity like Doña Ana is unable to continue providing its service because it is forced to pay damages in an antitrust suit, the burden of providing water service "for the public good" could easily fall on the state or local government. Accordingly, after evaluating SPA associations as special function governmental units according to the federal construction, we determine that an award for damages against an SPA association would take its toll on local government and that the state considers SPA associations to be governmental units. As a result, under the federal analysis, SPA associations are special function governmental units.

## III. CONCLUSION

{32} "Our goal in interpreting a statute is to determine and give effect to legislative intent." *N.M. Bd. of Veterinary Medicine v. Riegger,* 2007–NMSC–044, ¶ 11, 142 N.M. 248, 164 P.3d 947. We hold that the legislature intended for SPA associations to operate as governmental units and that SPA associations are similar to the other entities specifically identified in the NMAA's immunity provision. Further, we conclude that SPA associations would be immune from liability for damages under the federal LGAA, which defines "local government" using the same language as the NMAA. For these reasons, SPA associations are properly identified as special function governmental units that are immune from suit for damages under the NMAA. Although our holding prevents Moongate from recovering damages against Doña Ana, we observe that under Section 57–1–17(A), Moongate may still petition for injunctive relief against Doña Ana and the district court specifically allowed amendment of Moongate's complaint to allow for such a result.

{33} We affirm the district court.

{34} **IT IS SO ORDERED.**

WE CONCUR: JONATHAN B. SUTIN, Chief Judge, and CYNTHIA A. FRY, Judge.