**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2012-NMCA-058**

**Filing Date: April 18, 2012**

**Docket No. 30,540**

**LISA NASS-ROMERO,**
**on behalf of herself and all**
**others similarly situated,**

       **Plaintiff-Appellant,**

**v.**

**VISA U.S.A. INC. and MASTERCARD**
**INTERNATIONAL INCORPORATED,**

       **Defendants-Appellees.**

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Sarah M. Singleton, District Judge**

Youtz & Valdez, P.C.
Shane C. Youtz
Albuquerque, NM

Cuneo Gilbert & LaDuca, LLP
Jonathan W. Cuneo
Washington, D.C.

Cuneo Gilbert & LaDuca, LLP
Daniel Cohen
Alexandria, VA

Law Offices of Gordon Ball
Gordon Ball
Knoxville, TN

Hagens Berman LLP
George Samson
Seattle, WA

1

for Appellant

Jones, Snead, Wertheim &
  Wentworth, P.A.
Jerry Todd Wertheim
Santa Fe, NM

Paul, Weiss, Rifkind, Wharton
  & Garrison LLP
Kenneth A. Gallo
Washington, D.C.

Gary R. Carney
New York, NY

for Appellee MasterCard International Incorporated

Rodey, Dickason, Sloan, Akin
  & Robb, P.A.
Leslie McCarthy Apodaca
Albuquerque, NM

Arnold & Porter LLP
Robert C. Mason
New York, NY

for Appellee Visa U.S.A. Inc.

**OPINION**

**CASTILLO, Chief Judge.**

**{1}**    Plaintiff Nass-Romero, seeking to represent a class of New Mexico consumers, brought suit against two credit card companies alleging common law claims, violations of the New Mexico Antitrust Act (NMAA), NMSA 1978, Sections 57-1-1 through -15 (1891, as amended through 1987), and violations of the New Mexico Unfair Practices Act (UPA), NMSA 1978, Sections 57-12-1 through -26 (1967, as amended through 2009). The district court dismissed the complaint. Plaintiff appeals the dismissal of only those claims under the NMAA. We affirm.

## I.    BACKGROUND

**{2}**    We begin by providing a short history of the events leading to the filing of this complaint. In 1996, merchants and retail trade associations sued Visa U.S.A.

Inc., and MasterCard International Incorporated (Visa, MasterCard, or, together, Defendants) alleging that Defendants violated federal antitrust laws by forcing merchants who accepted their credit cards in the regular course of business to also accept the companies' debit cards. *See In re Visa Check/MasterMoney Antitrust Litig.*, 192 F.R.D. 68, 73 (E.D.N.Y. 2000), *aff'd*, 280 F.3d 124 (2d Circ. 2001). The merchants claimed that such a "tying" arrangement was an attempt to monopolize the debit card market, forcing the merchants to pay debit card fees that were higher than those provided by other debit networks. *See id.* A class of more than four million merchants was certified in 2000. *See id.* at 73. In 2003, the parties settled, and Visa and MasterCard agreed to pay more than $3 billion into a settlement fund. *See In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503, 506-07 (E.D.N.Y. 2003). The settlement was approved by the court, *see id.* at 512, and affirmed at the appellate level. *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 124 (2d Cir. 2005).

{3}     On the heels of that massive lawsuit and settlement, consumers in eighteen other states and the District of Columbia filed class-action suits against Defendants alleging violations of the individual states' antitrust laws and, in some cases, violations of the states' consumer protection laws. The consumers claimed that the tying arrangements that resulted in higher debit processing fees for merchants forced those merchants to pass the cost along to all consumers in the form of higher prices for all retail goods subsequently sold. Courts dismissed the consumer cases in fourteen states and in the District of Columbia.[1] In two states, Florida and Nevada, consumers voluntarily dismissed their complaints. In West Virginia, the state attorney

---

[1] *See Consiglio-Tseffos v. Visa U.S.A., Inc.*, 2004 WL 3030043 (Ariz. Super. Ct., Dec. 8, 2004; *In re Credit/Debit Card Tying Cases*, 2004 WL 2475287 (Cal. Super. Ct., Oct. 14, 2004); *Goldberg v. Visa U.S.A., Inc.*, 2007 WL 2011732 (D.C. Super. Ct., March 2, 2007); *Peterson v. Visa U.S.A., Inc.*, 2005 WL 1403761 (D.C. Super. Ct., April 22, 2005); *Southard v. Visa U.S.A. Inc.*, 734 N.W.2d 192 (Iowa 2007); *Moore v. Visa U.S.A., Inc.*, 2004 WL 3030032 (Kan. Dist. Ct., Nov. 15, 2004); *Knowles v. Visa U.S.A. Inc.*, 2004 WL 2475284 (Me. Super. Ct., Oct. 20, 2004); *Stark v. Visa U.S.A., Inc.*, 2004 WL 1879003 (Mich. Cir. Ct., July 23, 2004); *Smith v. Visa U.S.A., Inc.*, 2005 WL 1936336 (Minn. Dist. Ct., July 12, 2005); *Gutzwiller v. Visa U.S.A., Inc.*, 2004 WL 2114991 (Minn. Dist. Ct., Sept. 15, 2004); *Tackitt v. Visa U.S.A., Inc.*, 2004 WL 2475281 (Neb. Dist. Ct., Oct. 19, 2004); *Kanne v. Visa U.S.A. Inc.*, 723 N.W.2d 293 (Neb. 2006); *Ho v. Visa U.S.A., Inc.*, 793 N.Y.S.2d 8 (N.Y. App. Div. 2005); *Crouch v. Crompton Corp.*, 2004 WL 2414027 (N.C. Super. Ct., Oct. 28, 2004); *Beckler v. Visa U.S.A., Inc.*, 2004 WL 2475100 (N.D. Dist. Ct., Sept. 21, 2004); *Cornelison v. Visa U.S.A., Inc.*, No. 03-1350 (S.D. Cir. Ct., Sept. 29, 2004); *Bennett v. Visa U.S.A. Inc.*, 198 S.W.3d 747 (Tenn. Ct. App. 2006); *Fucile v. Visa U.S.A., Inc.*, 2004 WL 3030037 (Vt. Super. Ct., Dec. 27, 2004); *Strang v. Visa U.S.A., Inc.*, 2005 WL 1403769 (Wis. Cir. Ct., Feb. 8, 2005).

general brought a *parens patriae* action on behalf of the state's consumers, and the attorney general decided to settle the case after the district court denied Defendants' motion for summary judgment. *See W. Va. v. Visa U.S.A., Inc.*, Civil Action No. 30-C-551 (Memorandum Order Denying Defendants' Motion for Summary Judgment, Oct. 14, 2005); Darrell V. McGraw, Jr., *2009 Annual Report: The West Virginia Attorney General's Report on the Activities of the Consumer Protection and Antitrust Divisions*, 62-63, http://www.wvago.gov/pdf/annualreports/2009_report.pdf.

{4} In New Mexico, Plaintiff filed a 186-paragraph complaint with essentially the same allegations as claimed in the suits filed by the merchants in the federal action and by other state consumers—that the anti-competitive behavior of Visa and MasterCard regarding their debit card fee-processing system forced merchants to pass on costs to consumers. Specifically, Plaintiff claims she bought retail goods from "one or more [m]erchants located in New Mexico who were forced by Visa and/or MasterCard to accept their customers' *Visa Check* and/or *MasterMoney* debit cards when those debit cards were presented by them for payment as a condition of being able to accept Visa and/or MasterCard credit cards." She also alleges that Visa and MasterCard's debit card transaction fees are significantly higher than the fees charged by providers of debit services and that the alleged debit card scheme imposes a hidden sales tax on every retail transaction affecting hundreds of thousands of consumers in New Mexico, regardless of whether a credit or debit transaction took place during a given purchase. Plaintiff also seeks class certification on behalf of "tens of thousands" of New Mexico consumers who have made purchases of any number of goods from merchants who accepted Visa and MasterCard's credit and debit cards as a form of payment.

{5} Six years into the proceedings, the district court granted Defendants' motion to dismiss. It ruled that Plaintiff did not have standing to bring a claim under either the NMAA or the UPA and that Plaintiff failed to state a claim under the UPA. The district court dismissed the common law claims of unjust enrichment and of money had and received, finding that Defendants realized no benefit in the alleged scheme. In this appeal, Plaintiff limits her challenge to the dismissal of her claims under the NMAA. Specifically she argues that the district court erred (1) in determining that Plaintiff's injuries were too remote to provide standing to bring suit under the NMAA; and (2) in failing to find that Plaintiff was within the target area of the actions of Visa and MasterCard.

## II. DISCUSSION

### A. Standard of Review

{6} A motion to dismiss "is infrequently granted because its purpose is to test the law of the claim, not the facts that support it." *Envtl. Improvement Div. v. Aguayo*, 99 N.M. 497, 499, 660 P.2d 587, 589 (1983). In reviewing a district court's decision to dismiss for failure to state a claim, "we accept as true all well-pleaded factual allegations in the complaint and resolve all doubts in favor of the complaint's sufficiency." *N.M. Pub. Schs. Ins. Auth. v.*

4

*Arthur J. Gallagher & Co.*, 2008-NMSC-067, ¶ 11, 145 N.M. 316, 198 P.3d 342. "A Rule [1-0]12([B])(6) [NMRA] motion is *only* proper when it appears that plaintiff can neither recover nor obtain relief under any state of facts provable under the claim." *Valdez v. State*, 2002-NMSC-028, ¶ 4, 132 N.M. 667, 54 P.3d 71 (internal quotation marks and citation omitted). "A district court's decision to dismiss a case for failure to state a claim under Rule 1-012(B)(6) is reviewed de novo." *Valdez*, 2002-NMSC-028, ¶ 4. "Whether a party has standing to litigate a particular issue is a question of law, which we review de novo." *City of Sunland Park v. Santa Teresa Servs. Co.*, 2003-NMCA-106, ¶ 39, 134 N.M. 243, 75 P.3d 843.

**B.      Plaintiff Lacks Standing to Bring a Claim Under the NMAA**

**{7}**     We turn first to Plaintiff's assertion of error in the district court's dismissal of the action for lack of standing. "Dismissals under Rule 1-012(B)(6) are proper when the claim asserted is legally deficient." *Delfino v. Griffo*, 2011-NMSC-015, ¶ 9, 150 N.M. 97, 257 P.3d 917. A plaintiff's standing is a "jurisdictional prerequisite to an action." *ACLU of N.M. v. City of Albuquerque*, 2008-NMSC-045, ¶ 9 n.1, 144 N.M. 471, 188 P.3d 1222 (internal quotation marks and citation omitted).

**{8}**     To evaluate whether Plaintiff has standing sufficient to assert a claim here, we look at the text of the NMAA. Antitrust legislation barring monopolistic restraint of trade began with the federal Sherman Antitrust Act (Sherman Act), enacted by Congress in 1890. *See* 15 U.S.C. §§ 1 through 7 (2004). One year later, in 1891, the New Mexico Territorial Legislature enacted the NMAA that is based on the Sherman Act. *See* §§ 57-1-1 through -19. In 1914, Congress enacted a follow-up statute, the Clayton Act, to bolster the original act's enforcement mechanisms. *See* 15 U.S.C. § 15(a). The NMAA contains a similar provision and allows recovery to "any person threatened with injury or injured in his business or property" by a violation of the NMAA. Section 57-1-3.

**{9}**     Our determination regarding standing involves a question of statutory interpretation that in turn involves an understanding of the interplay between federal and state antitrust law. The NMAA "shall be construed in harmony with judicial interpretations of the federal antitrust laws. This construction shall be made to achieve uniform application of the state and federal laws prohibiting restraints of trade and monopolistic practices." Section 57-1-15. According to our Supreme Court, "[t]he underlying purposes behind both the federal and state [l]aws are the same, to establish a public policy of first magnitude; that is, promoting the national interest in a competitive economy." *United Nuclear Corp. v. Gen. Atomic Co.*, 93 N.M. 105, 125, 597 P.2d 290, 310 (1979) (internal quotation marks and citation omitted). Recently, the Court reaffirmed that the state and federal antitrust statutes should be read in harmony: "It is therefore the duty of the courts to ensure that New Mexico antitrust law does not deviate substantially from federal interpretations of antitrust law." *Romero v. Philip Morris Inc.*, 2010-NMSC-035, ¶ 18, 148 N.M. 713, 242 P.3d 280. New Mexico courts therefore look to federal antitrust law to determine the meaning of provisions of the NMAA. *See State v. Ray Bell Oil Co.*, 101 N.M. 368, 370, 683 P.2d 50, 52 (Ct. App. 1983).

{10}    With this as a background, we now turn to Plaintiff's challenge to the district court's finding that she lacked standing under the NMAA. New Mexico has adopted a three-part test to address standing in general: "To acquire standing to litigate a particular issue, a party must demonstrate (1) an injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable decision." *City of Sunland Park*, 2003-NMCA-106, ¶ 40 (internal quotation marks and citations omitted). Plaintiff here asks us to break the standing question into several parts—the above three-step analysis as well as a discussion of whether consumers were in the "target area" of Defendants' actions or whether the harm to Plaintiff that flowed from Defendants' actions was "foreseeable" enough to create standing in Plaintiff. We decline Plaintiff's invitation because her suggested tangents are subsumed into the basic analysis of standing. "Even where a party demonstrates these three elements, standing may be denied if the interest the complainant seeks to protect is not within the 'zone of interests' protected or regulated by the statute or constitutional provision the party is relying upon. The concepts of injury and zone of interest are thus intertwined." *Id.* In support of her position, Plaintiff cites *Key v. Chrysler Motors Corp.*, 1996-NMSC-038, 121 N.M. 764, 768, 918 P.2d 350, 354, for the proposition that a claimant must show "that the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute[,]" and she contends that she meets this test. *Id.* (internal quotation marks and citation omitted). We first observe that this is not an antitrust case. And while we agree that the cited statement is contained in *Key*, there is more. *Key* goes on to state that in order to assess a plaintiff's standing "we must look to the Legislature's intent as expressed in the [applicable] Act or other relevant authority." *Id.* Here, the Legislature has clearly spoken, requiring that the NMAA be interpreted in harmony with federal law.

{11}    Plaintiff also argues that she should have standing because the economic effect on her and other consumers was foreseeable. This argument has been considered elsewhere and, like those other courts, we decline to adopt such a standard for antitrust cases. *See Reibert v. Atlantic Richfield Co.*, 471 F.2d 727, 731 (10th Cir. 1973) ("Antitrust violations admittedly create foreseeable ripples of injury to individual stockholders, consumers[,] and employees, but the law has not allowed all of these standing to sue for treble damages."); *Southard*, 734 N.W.2d at 197 (stating in a parallel case against Visa and MasterCard that "[t]he remoteness doctrine is not based upon a factual inquiry to determine whether the damages claimed were foreseeable or whether they were a proximate cause; rather, it is a legal doctrine incorporating public policy considerations" (internal quotation marks and citation omitted)); *Fucile*, 2004 WL 3030037, at *4 (stating in a parallel case against Visa and MasterCard that "[t]he defendants could not be expected to foresee an antitrust violation affecting merchants to result in increased cost of goods throughout the entire consumer base and to so injure that consumer base as to result in liability to every consumer in the country"). Instead, we follow the direction of the NMAA itself, rely on the general guidance regarding standing found in *Key*, and conduct a standing analysis for the NMAA that is in harmony with federal court interpretations of antitrust jurisprudence. *See City of Sunland Park*, 2003-NMCA-106, ¶ 41 ("Cases in New Mexico are clear that injury—whether actual or threatened—is not enough by itself to confer standing. To be accorded standing on a

6

particular issue the party must show that the statute or constitutional provision relied on reaches or provides protection against the injury.").

{12}   Having rejected the alternative approaches put forth by Plaintiff, we proceed to evaluate whether Plaintiff has standing based on the provisions of the NMAA and on federal antitrust jurisprudence. Both parties agree that the relevant precedent guiding a standing analysis in federal antitrust litigation is *Associated Gen. Contractors v. California State Council of Carpenters* (*AGC*), 459 U.S. 519 (1983). There, the United States Supreme Court suggested that the loose concepts of "zone of interest" and "foreseeability" are not adequate to confer standing.

> An antitrust violation may be expected to cause ripples of harm to flow through the [n]ation's economy; but despite the broad wording of [15 U.S.C.] § 4 there is a point beyond which the wrongdoer should not be held liable. It is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property.

> It is plain, therefore, that the question whether the [plaintiff] may recover for the injury it allegedly suffered by reason of the defendants' coercion against certain third parties cannot be answered simply by reference to the broad language of [15 U.S.C.] § 4.

*Id.* at 534-35 (internal quotation marks and citations omitted).

{13}   In *AGC*, the Court was concerned with "keeping the scope of complex antitrust trials within judicially manageable limits." *Id.* at 543. In this regard, the *AGC* Court set out five factors to consider in analyzing the issue of standing: (1) whether the plaintiffs were participants in the allegedly restrained market; (2) the directness of the plaintiff's alleged harm; (3) whether there is a better potential plaintiff; (4) whether the plaintiff's theory of damages is speculative; and (5) the complexity of apportioning damages and the risk of duplicative liability. *Id.* at 538-45. We now turn to each of the factors and evaluate them based on Plaintiff's allegations.

1.   **Market Participation**

{14}   The market at issue is the debit processing service of Visa and MasterCard that involves Defendants, their member banks, and the merchants who honor their cards. Plaintiff is neither a consumer nor a competitor in the market allegedly being restrained by Defendants and does not appear in that chain of distribution; thus, she cannot be identified as a consumer of the service provided by Visa and MasterCard. Plaintiff, instead, is a consumer of goods sold by merchants who happen to be part of the affected market. Other jurisdictions agree. *See, e.g., Kanne*, 723 N.W.2d at 298 (concluding that the consumer-plaintiffs were "not competitors in the allegedly affected market, which is the business of

7

providing debit network processing services to merchants . . . [n]or . . . consumers of those services"); *Southard*, 734 N.W.2d at 199 (characterizing consumer plaintiffs as "neither consumers of the defendants' products nor competitors of the defendants").

### 2.  Directness of Harm

{15}  Here, Plaintiff alleges that Defendants' tying arrangements led to "exorbitant fees . . . passed on to . . . Plaintiff and [c]lass members in the form of artificially higher and advanced prices." Plaintiff's allegations do not show that she was directly harmed by the actions of Visa and MasterCard; nor do they show that she was indirectly harmed through the chain of distribution of the debit card services. The alleged harm caused by Defendants' tying scheme takes an abrupt left turn after reaching the merchants and branches off into supposed higher prices for all goods throughout New Mexico, mutating into a different form of harm to consumers. Plaintiff's injury is better characterized as remote or derivative. *See Southard*, 734 N.W.2d at 199 ("Clearly, the injuries alleged by the plaintiffs are not even indirect, as the plaintiffs are not in the chain of distribution. Their injuries are better described as derivative."); *Ho*, 793 N.Y.S.2d at 9 ("Those injuries are too remote and derivative to countenance such a cause of action.").

### 3.  A Better Plaintiff

{16}  In the case before us, Plaintiff is a consumer who is not directly affected by the alleged tying arrangement. The better plaintiffs to challenge Defendants' business practices have already come forward. They are the merchants themselves, led by Wal-mart, who first brought suit in 1996 and who settled with Visa and MasterCard in 2003, setting up a $3.1 billion fund to make whole the merchants affected by debit card transaction fees. Preventing Plaintiff here from bringing a claim under the NMAA will not "leave a significant antitrust violation undetected or unremedied." *AGC,* 459 U.S. at 542; *see Ho*, 793 N.Y.S.2d at 9 (finding that Visa and MasterCard "have been subjected to judicial remediation for their wrongs, and any recovery here would be duplicative").

### 4.  Speculative Damages

{17}  We now evaluate the nature of Plaintiff's alleged damages. Plaintiff asserts that her damages are based on the overcharges she paid on every retail item she bought from every merchant in New Mexico that accepted Visa and MasterCard credit and debit cards over the course of several years. By way of example, Plaintiff would ask a court to find that paying, say, $1.99 for a dozen eggs rather than $1.89 during a random shopping trip to a particular grocer was the indirect result of the excessive debit card transaction fees paid by the grocer to the member banks of Visa and MasterCard. Plaintiff would be alleging that for this particular purchase, and for the millions of small purchases made by "tens of thousands" of New Mexicans at dozens or perhaps hundreds of retail outfits throughout the state, the merchant chose not to absorb the debit card transaction fee but rather passed that cost on to the consumer. Such a calculation would ignore the countless considerations that go into the

8

set price of any given product at any given store on any given day. *See Kanne*, 723 N.W.2d at 299 (stating that "the claimed price increases over a period of years could have resulted from myriad independent reasons unrelated to the alleged violation" (internal quotation marks and citation omitted)). Because the alleged damages could have been produced by numerous independent factors, Plaintiff's damage claim is speculative.

### 5. Complexity of Apportioning Damages; Risk of Duplicative Liability

{18} The United States Supreme Court has emphasized "the importance of avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other." *AGC*, 459 U.S. at 543-44. The Court feared that such damage calculations "would often require additional long and complicated proceedings involving massive evidence and complicated theories." *Id.* at 544 (internal quotation marks and citation omitted). As the Maine Superior Court stated in a parallel case against Defendants,

> [t]o determine what portion of any overcharge was passed on by any given merchant, with respect to which products, and to which consumers is a task of monumental uncertainty and complexity. Depending on their other costs, their competitive position in the market, their profit margins, and the specific products they sold, some merchants could have absorbed a substantial portion of any overcharge instead of passing it on.

*Knowles*, 2004 WL 2475284, at *6. "For any given consumer, the issue is even more complicated and speculative because the inquiry would involve what items that particular consumer purchased, what that consumer paid for each item, and what percentage of overcharge, if any, was contained in that price." *Id.*; *see* Kellen S. Dwyer, *With the* Illinois Brick *Wall Down, What's Left? Determining Antitrust Standing Under State Law*, 3 J. Bus. Entrepreneurship & the Law 255, 279 (2010) (hereinafter Dwyer) ("Showing the pass-on would require an estimation of the elasticity of demand for almost every product sold in the state. Even if that feat were possible, it is hard to imagine how the funds could be apportioned."). In addition, the risk of duplicative liability is apparent. Defendants settled with merchants nine years ago for more than $3 billion and thus were made to pay for the alleged antitrust violations. Under Plaintiff's theory of the case, merchants who benefitted from the settlement could conceivably have turned around and lowered the prices of their goods, thus providing consumers with relief from any previously passed-along costs emanating from the debit card transaction fees. Apportioning damages would be a complex task, and there is a risk of duplicative damages.

{19} The *AGC* factors do not fall in Plaintiff's favor. Taking the factors in sum, we conclude that Plaintiff's claim fails the test and fails to prove she has standing to bring a claim under the NMAA.

{20} As an alternative, Plaintiff argues that *AGC* should not apply to her claim at all because the facts of *AGC* can be distinguished from the facts of her case. Plaintiff points out

that she is a consumer facing overcharges, whereas the plaintiff labor union in *AGC* was not a consumer and was not subject to overcharges. However, the Court in *AGC* made it clear that its five-factor analysis applied to the broad spectrum of antitrust claims, including those involving consumers. *See* 459 U.S. at 538 (stating that "the Sherman Act was enacted to assure customers the benefits of price competition, and our prior cases have emphasized the central interest in protecting the economic freedom of participants in the relevant market"). And the author of *AGC*, Justice Stevens, more recently reiterated the broad application of that five-factor analysis. *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 416 (2004) (Stevens, Souter & Thomas, JJ., concurring) (applying the *AGC* factors and reasoning that "we have eschewed a literal reading of [15 U.S.C.] § 4, particularly in cases in which there is only an indirect relationship between the defendant's alleged misconduct and the plaintiff's asserted injury"); *see also Hawaii v. Standard Oil Co.*, 405 U.S. 251, 264 n.14 (1972) ("The lower courts have been virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation."). We conclude that *AGC* is applicable to the case before us even though its facts are distinguishable.

**{21}** Plaintiff further argues, though, that the NMAA offers a broader basis for consumers to bring an antitrust action and that it diverges from federal law by allowing suits to be brought by those "indirectly" harmed by monopolistic behavior. Section 57-1-3. The NMAA was modified in 1979 to counteract the U.S. Supreme Court's decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), which had barred antitrust suits by "indirect" purchasers in a distribution scheme. New Mexico, as did other states, responded by clarifying its statute to allow suits by those claiming to have been harmed indirectly. Plaintiff thus suggests that the revised NMAA deserves an expansive reading that finds a broad legislative intent to protect consumers.

**{22}** First, as stated above, we reject Plaintiff's claim that she is an indirect purchaser in the distribution scheme at hand; rather, her claim is distinct from and derivative of a distribution network for debit card services that involves Defendants, their member banks, and merchants. Further, Plaintiff misreads the Supreme Court's opinion in *Illinois Brick* and conflates its statutory analysis with an analysis of standing. The *Illinois Brick* Court was focused not on standing but rather on a straight interpretation of the statute amid the Court's concerns about allowing multiple treble damages liability throughout a given chain of distribution of goods. *Id.* at 736-37. The Court was careful to distinguish between the issue presented—the question of whether the federal antitrust act allows an indirect purchaser to bring suit—and the broader issue of standing: "[W]e do not address the standing issue, except to note . . . that the question of which persons have been injured by an illegal overcharge . . . *is analytically distinct* from the question of which persons have sustained injuries too remote to give them standing to sue for damages under [15 U.S.C.] § 4." *Illinois Brick*, 431 U.S. at 728 n.7 (emphasis added). Even the *Illinois Brick* dissent by Justice Brennan acknowledged that "there is a point beyond which the wrongdoer should not be held liable." *Id.* at 760 (Brennan, Marshall, & Blackmun, JJ., dissenting). The dissent continued: "Courts have therefore developed various tests of antitrust 'standing' . . . to define that

point." *Id.* The full Court, in a subsequent case, reiterated that standing requirements and questions of "which persons have sustained injuries that are too remote" remain "[a]nalytically distinct" from *Illinois Brick*'s bar against indirect purchasers. *Blue Shield v. McCready*, 457 U.S. 465, 476 (1982) (emphasis, internal quotation marks, and citation omitted). Thus, "[b]ecause *Illinois Brick* did not alter the Court's antitrust standing jurisprudence, *Illinois Brick*'s repeal should imply nothing about standing." Dwyer, *supra*, at 263 (emphasis added).

**{23}** Plaintiff can point to only one other jurisdiction that has ruled in favor of consumers in a similar case against Defendants: *W. Virginia*, Civil Action No. 30-C-551. This is an unpublished decision in which the court prefaces its discussion by stating that it was not conducting a full analysis of the issue of standing. *Id.* Further, the West Virginia district court's discussion of *Illinois Brick* repealer statutes suffers from lack of nuance and falls short of a full assessment of standing in such cases. Thus, it stands alone as an unreliable outlier against every other jurisdiction that has denied standing to similarly situated plaintiffs bringing derivative actions against Visa and MasterCard. *See, e.g.*, *Kanne*, 723 N.W.2d at 299-300; *Knowles*, 2004 WL 2475284 at *3; *Stark*, 2004 WL 1879003 at *3-4. The Minnesota Supreme Court, in a follow-up case to its consumer suits against Defendants, observed that "*Illinois Brick* addressed the scope of antitrust injury, not standing, under the Clayton Act." *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 629 (Minn. 2007). The court concluded: "Whatever the precise prudential limits on Minnesota antitrust standing, we do not believe that the legislature intended to create 'consumer standing' by allowing every person in the state to sue for an antitrust violation simply by virtue of his or her status as a consumer." *Id.* at 632. We similarly conclude that Plaintiff lacks standing to bring a claim against Visa and MasterCard under the NMAA for the alleged tying scheme that forced merchants to accept Defendants' debit cards at inflated transaction-fee rates.

## III.    CONCLUSION

**{24}** For the foregoing reasons, we affirm the decision of the district court.

**{25}    IT IS SO ORDERED.**

---

**CELIA FOY CASTILLO, Chief Judge**

**WE CONCUR:**

---

**CYNTHIA A. FRY, Judge**

---

**RODERICK T. KENNEDY, Judge**

11

**Topic Index for *Nass-Romero v. Visa USA, Inc.*, Docket No. 30,540**

| | |
|---|---|
| **AE** | **APPEAL AND ERROR** |
| AE-SR | Standard of Review |
| | |
| **CP** | **CIVIL PROCEDURE** |
| CP-CA | Class Actions |
| CP-SD | Standing |
| | |
| **CT** | **CONSTITUTIONAL LAW** |
| CT-SD | Standing |
| | |
| **FL** | **FEDERAL LAW** |
| FL-AN | Antitrust |
| | |
| **MS** | **MISCELLANEOUS STATUTES** |
| MS-AN | Antitrust Act |
| MS-UP | Unfair Practices Act |
| | |
| **RE** | **REMEDIES** |
| RE-DG | Damages, General |
| RE-MD | Measure of Damages |
| RE-ND | Nominal Damages |
| | |
| **ST** | **STATUTES** |
| ST-IP | Interpretation |
| ST-LI | Legislative Intent |